Arthur B. MAURER and Mary E. Ford Maurer, Appellants,

v.

UNITED STATES of America, Appellee.

No. 6376.

United States Court of Appeals
Tenth Circuit.

Nov. 4, 1960.

Elmer B. Hodges, Kansas City, Mo. (John K. Dear, Kansas City, Kan., on brief), for appellants.

Harold M. Seidel, Washington, D. C. (Charles K. Rice, Lee A. Jackson, I. Henry Kutz and William A. Freidlander, Washington, D. C., on brief), for appellee.

Before MURRAH, Chief Judge, and BRATTON and PICKETT, Circuit Judges.

MURRAH, Chief Judge.

In the taxable year 1954, the taxpayer-appellants suffered certain losses due to severe drought and abnormal weather conditions. Several trees and valuable plantings on their residential grounds were killed and there was other physical damage. The losses were not compensated for by insurance, or otherwise, and they now seek to deduct them as ordinary losses under Title 26 U.S.C. § 165.[1]  The

---

1. 26 U.S.C. § 165 provides:

"(a) General rule.—There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.

\*     \*     \*     \*     \*

"(c) Limitation on losses of individuals.—In the case of an individual, the deduction under subsection (a) shall be limited to—

\*     \*     \*     \*     \*

"(3) losses of property not connected with a trade or business, if such losses

Commissioner denied the deduction and assessed a deficiency based upon his construction and application of Title 26 U.S. C. § 1231,[2] and the pertinent treasury regulation, § 1.1231–1(e).[3] The taxpayers paid the additional tax and brought this action for refund.

At the trial, two issues were presented to a jury: (1) whether this loss was a casualty as defined in the Internal Revenue Code, and, if so, (2) the extent of the decrease in market value of the taxpayers' property as a result thereof. It was found that the loss was a casualty, and the property had decreased in value by $10,000. The casualty loss and amount thereof having been thus established, there remained the question whether it was an ordinary loss under Section 165 or a capital loss under Section 1231. Section (a) of this latter statute provides in substance that where there is an "involuntary conversion" of capital assets into "other property or money," the losses must be offset by gains incurred during the same period. Subsection (a) (2) defines involuntary conversions as "losses upon the destruction * * * of * * * capital assets held for more than 6 months * * *." The trial court was of the opinion [4] that this definitive subsection "extends the reach" of the statute to include all in-

voluntary conversions of capital assets whether compensated or not; and that to hold otherwise would accord unintended favorable treatment to an uninsured taxpayer.

■ Section 165, and its predecessor 23(e), have traditionally been the means for deducting uncompensated casualty losses from income where, as here, the property is non-income producing.[5] The casualty loss having been established by the special verdict of the jury in our case, it is deductible under Section 165 unless preempted by Section 1231. In other words, the two statutes are mutually exclusive and our problem is to put each into its proper frame of reference.

■ In order to fully comprehend the true import and taxable incidence of Section 1231, it is necessary to consider some of the legislative history and original purposes of the Section. It first became a part of the 1939 Internal Revenue Code in 1942, as Section 117(j). The avowed purpose was to allow taxpayers, whose property had been seized in furtherance of the war effort a capital gain rather than an increase in ordinary income. This is so because not infrequently the taxpayer received much more for his seized property than his depreciated cost, and it seemed unjust to tax him at wartime's exceptionally high income tax

arise from fire, storm, shipwreck, or other casualty, or from theft * * *."

2. 26 U.S.C. § 1231 provides:
"(a) General rule.—If, during the taxable year * * * the recognized gains from the compulsory or involuntary conversion (as a result of destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condemnation or the threat or imminence thereof) of * * * capital assets held for more than 6 months into other property or money, exceed the recognized losses from such sales, exchanges, and conversions, such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months. If such gains do not exceed such losses, such gains and losses shall not be considered as gains and losses from sales or exchanges of capital assets. For purposes of this subsection—

$$* \quad * \quad * \quad * \quad *$$

"(2) losses upon the destruction, in whole or in part, theft or seizure, or requisition or condemnation of property used in the trade or business or capital assets held for more than 6 months shall be considered losses from a compulsory or involuntary conversion."

3. The Treasury Regulation, § 1.1231–1 provides:
" * * * (e) Involuntary conversion. For purposes of Section 1231 * * * Losses upon the complete or partial destruction, theft, seizure, requisition or condemnation of property are treated as losses upon an involuntary conversion whether or not there is a conversion of the property into other property or money."

4. Reported at 178 F.Supp. 223, 224.

5. Mertens, Law of Federal Income Taxation, Chap. 28, § 28.01 et seq.

rates. Conversely, the legislation provided in the event a net loss was sustained, the taxpayer should be entitled to an ordinary deduction.[6] Thus, the effect of Section 1231 is twofold. If the gains exceed the losses, there is a capital gain treatment, and if the losses are greater, they are ordinary deductions. Viewed in this light, it seems clear that Section 1231 is aimed at involuntary conversions where "other property or money" is received in return, i. e., compensated losses, leaving Section 165 applicable to uncompensated losses.

If a taxpayer has seen fit to insure his property, he is, in due course, compensated by his insurer and the loss reduced proportionately. If, however, the casualty is uncompensated, it seems to follow that he should be allowed an ordinary deduction. This is made clear when it is seen that Section 1231 is contextually similar to the sections dealing with capital gains and losses.[7] Thus, a compensated loss is a taxable event closely akin to a "sale or exchange" albeit an involuntary one. Where, however, the taxpayer receives nothing in return, the factual situation is entirely different and there is no rational basis for capital loss treatment. If he can prove that the loss qualifies as a "casualty," it is only logical to conclude that Congress intended that there be an ordinary deduction under Section 165.

The government urges that this result will read the definition of "involuntary conversion," found in Subsection (a) (2) out of the statute, but we do not think

so. If the statute is construed to apply to compensated involuntary conversions, the definition is still useful in arriving at a meaning for the term. But we are convinced that the Subsection serves only a definitive function and has no intended substantive effect.

■ We are then left with the question of the force and effect of the Treasury Regulation, § 1.1231–1(e), when it says that involuntary conversions are to be treated under Section 1231, "whether or not there is a conversion into other property or money." This can lead to only one of two conclusions, either the Regulation is clearly inconsistent with the terms of the statute and invalid,[8] or else it is inapplicable in this particular situation. Since there is a presumption of the validity of a regulation which was in force when a statute was reenacted,[9] as here,[10] we believe that it applies only to "involuntary conversions." The regulation may be an attempt to distinguish involuntary conversions from casualties, but because of the jury's determination we are presented with no question turning on this distinction. If the loss had been found to be an involuntary conversion, we would then be called upon to rule whether the regulation can be allowed to stand in the face of the plain wording of Section 1231.

We therefore conclude that Section 1231 is inapplicable here, and the judgment is reversed and remanded for recomputation of the taxpayers' liability in accordance with Section 165.

6. See Report of the House Ways and Means Committee (C. B. 1942–2, p. 415).

7. See generally: Subchapter P of 1954 I.R.C.

8. See Manhattan General Equipment Co. v. C. I. R., 297 U.S. 129, 56 S.Ct. 397, 80 L.Ed. 528; Helvering v. Credit Alliance Corp., 316 U.S. 107, 62 S.Ct. 989, 86 L.Ed. 1307.

9. See Helvering v. Winmill, 305 U.S. 79, 83, 59 S.Ct. 45, 83 L.Ed. 52; Commis-

sioner of Internal Revenue v. Flowers, 326 U.S. 465, 469, 66 S.Ct. 250, 90 L. Ed. 203; Boehm v. Commissioner, 326 U.S. 287, 291–292, 66 S.Ct. 120, 90 L.Ed. 78; Cammarano v. United States, 358 U.S. 498, 510–512, 79 S.Ct. 524, 3 L.Ed.2d 462. But also see Biddle v. Commissioner, 302 U.S. 573, 582, 58 S. Ct. 379, 82 L.Ed. 431.

10. The regulation was effective when Section 117(j) was reenacted in 1954, into Section 1231.