**WEYERHAEUSER COMPANY, a Washington Corporation, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**UNITED STATES of America, Appellant,**

v.

**WEYERHAEUSER COMPANY, a Washington Corporation, Appellee.**

Nos. 21834, 21834–A.

United States Court of Appeals
Ninth Circuit.

Oct. 22, 1968.

As Amended Nov. 22, 1968.

John T. Piper (argued), G. Perrin Walker, Daniel C. Smith, Snyder J. King, Tacoma, Wash., for appellant.

Grant Wiprud (argued), Lee A. Jackson, Dept. of Justice, Mitchell Rogovin, Asst. Atty. Gen., Washington, D. C.; Eugene G. Cushing, U. S. Atty., Tacoma, Wash., for appellee.

Before HAMLEY and ELY, Circuit Judges, and VON DER HEYDT, District Judge.

ELY, Circuit Judge:

The dispute before us involves Weyerhaeuser's federal income taxes for the calendar years 1954 through 1957. Weyerhaeuser filed claims for refund of a portion of the taxes paid for each of these years. The Commissioner of Internal Revenue rejected the claims, and thereafter Weyerhaeuser brought suit in the District Court for recovery of the taxes which it claimed to have been collected erroneously. The District Court's pretrial order divided the issues into two parts, "First Question Presented" and "Second Question Presented." The two questions are unrelated both factually and legally. In the District Court the taxpayer prevailed on the "First Question" and the Government on the "Second." Both Weyerhaeuser and the United States have appealed from the determination of the District Court adverse to their respective positions. The District Court's jurisdiction rested upon 28 U.S.C. § 1346. Ours is conferred by 28 U.S.C. § 1291.

No. 21,834

Weyerhaeuser's appeal on the "Second Question Presented" challenges the District Court's treatment of gains realized by Weyerhaeuser during the calendar years 1956 and 1957 from the cutting of timber.

Weyerhaeuser and Scott Paper Company [1] have for many years been the owners of extensive timber lands which are a part of the watershed of Seattle, Washington. Anticipating logging by Weyerhaeuser and Scott on these lands, the City of Seattle undertook, beginning in 1945, a course of action directed at preserving the purity of its water supply and assuring reforestation. First, by means of an agreement among the interested parties, including the city, a limitation was placed upon the total amount of timber to be cut annually within the watershed. Secondly, it was agreed that Weyerhaeuser and Scott should join in this logging, conducting it as a single operation.

Pursuant to the understanding, Weyerhaeuser and Scott executed two contracts, both dated January 21, 1946. Under the first of these, to which Weyerhaeuser and Scott were the only parties, the disposition of all the Seattle watershed timber of both owners was controlled. The basic provision of this contract reads:

"The parties hereto agree that within forty (40) years after August 1, 1945 all of the timber in their respective tracts of timber described in Exhibit A which shall be suitable for sawlogs and other forest products shall be logged and removed and that one-half thereof shall be delivered in the form of sawlogs and other forest products to each of the companies. Said timber shall be logged and delivered in a single operation in the manner provided in the logging contract."

The parties recognized that the forest products which would be annually removed from each party's land would not be equal in quantity or value. Included in the contract, therefore, was a specific provision dealing with the prices which were to be charged for those forest products which were delivered to one party from the timber of the other. This provision reads:

"The stumpage to be paid by one company to the other from time to time shall be determined as follows: within ten (10) days after the close of each calendar year, the following prices shall be applied to the quantities of logs, hemlock pulpwood, and forest products other than said logs and pulpwood, removed and delivered from the timber of each of the parties hereto during the preceding calendar year: (1) the zone stumpage prices for logs prescribed in Exhibit A hereto, (2) the price of fifty (50¢) cents per cord of 128 cubic feet for hemlock pulpwood, and (3) the agreed price or prices, under paragraph II(a) above, for forest products other than logs and hemlock pulpwood. The difference in total prices, as so determined, shall be computed and one-half thereof shall be forthwith paid by the company from whose timber the lesser total value was produced during said year to the company from whose timber the greater value was produced."

Thus the basic agreement between Weyerhaeuser and Scott was that each year they would share equally all the timber products removed during the year from their lands in the Seattle watershed and that the party receiving, as its half share, more than its own lands had contributed during that year would pay for the excess at certain fixed prices. Additionally, the parties

"agreed that title to logs and other forest products delivered to the party

---

[1]. Soundview Pulp Company, Scott's predecessor in interest in the Seattle watershed, was in fact the original party to the contractual arrangements with Weyerhaeuser. For convenience, however, throughout this opinion only Scott, the present owner, will be referred to in this connection.

from whose timber the same were removed shall at all times remain in such party but that title to logs and other forest products removed from the timber of one of the Timber Companies and delivered to the other shall pass upon delivery to the latter."

In accord with the basic retention of title, each party also assumed the risk of loss of part or all of the timber on its own land from fire or other causes.[2] Finally, as the District Court noted, the contract contained no restraints on the parties as to the use or disposition of their respective half shares of the forest products after delivery. Weyerhaeuser used its half share in its manufacturing business.

The second contract executed by Weyerhaeuser and Scott on January 21, 1946, included Mountain Tree Farm Company as a third party. This company was a Washington corporation which was jointly owned and controlled by Weyerhaeuser and Scott. The contract between these three parties established Mountain Tree Farm Company [the "Operator"] as the sole entity authorized to harvest any timber on the Weyerhaeuser and Scott tracts in the Seattle watershed. Significant provisions of this contract are as follows:

"The timber owned by Weyerhaeuser within said Cedar River Watershed is designated by the letter 'W' on the schedule which is attached hereto, marked 'Exhibit A' and by this reference made a part hereof, the timber owned by * * * [Scott] within said Watershed is designated by the letter 'S' on said Exhibit and the said timber of the Timber Companies has been divided into Zones 1, 2 and 3, as indicated on said Exhibit. The Timber Companies agree with each other and with the Operator that the Operator shall, and it hereby agrees to enter into the timber of both of the Timber Companies described on said Exhibit A and to cut, log and manufacture into sawlogs so much of said timber as shall be suitable for sawlogs and to cut and manufacture into pulp wood so much of the hemlock forest materials thereafter remaining in said timber as will make marketable pulp wood and, if the Timber Companies hereafter jointly so direct, so much of the remaining forest materials of all other species as are marketable (all of which materials are hereinafter referred to as 'other forest products') and to deliver such logs and other forest products within the time and in the manner hereinafter provided. * * *

* * *

"All logs cut in the Operator's operations shall be plainly stamped or branded by the Operator with a log brand or hammer to be specified by the Timber Companies and furnished by the Operator. All of said logs shall be branded on each end, with at least four (4) impressions placed thereon as near as possible in the outer perimeter of the log, one impression in each quadrant thereof, and the brand so used shall contain the following: * * (2) the initial 'W' or the initial 'S' to indicate whether the log came from the holdings of Weyerhaeuser or Soundview, and (3) an appropriate number or other designation to indicate from which of the three (3) zones mentioned on Exhibit 'A' the log came. Registry of each such branch [sic] shall be in the name of the owner of the land, or timber, from which the logs are taken.

"All logs taken from all of the timber described on Exhibit A shall be transported by the Operator to the log dump of Snohomish River Boom Company at or near Everett, Washington, or to such other place or places as the Timber Companies may hereafter jointly instruct the Operator from time to time in writing. * * *

---

2. Since the timber on Weyerhaeuser's land was scheduled to be cut first, special provisions were placed in the contract in order to compensate Scott for the increased property tax burden which it would thereby incur.

"The Operator shall direct said Snohomish River Boom Company, or its substitute agency, if any, to sort all logs delivered by the Operator into rafts of such grades and species as the Timber Companies shall jointly direct from time to time and, as soon as possible after rafting, the Operator shall cause all logs to be scaled by an official scaler. * * *

"As rapidly as rafts of logs are made up and scaled, the Timber Companies agree that the Operator shall, and it agrees that it will deliver (or cause Snohomish River Boom Company or its substitute agency, if any, to deliver) rafts of logs to the Timber Companies in such manner that each shall receive one-half of all logs of each species produced by the Operator throughout the life of this agreement from the timber of both Timber Companies and so that the total footage of logs of each species delivered to each of said Companies shall be kept as nearly equal as possible at all times. One-half of the other forest products produced by the Operator shall be delivered by it from time to time to each of the Timber Companies at such delivery point in or near Everett, Washington, as each shall specify for itself from time to time and in such manner as to keep the total cordage or footage delivered to each Company as nearly equal as possible at all times."

Mountain Tree Farm Company was to be compensated on a cost-plus-fixed-fee basis for its services under this contract, and Weyerhaeuser and Scott were each generally obligated to provide one-half of the cost of the logging, including the operator's compensation.

For the years 1946 through 1957, Weyerhaeuser claimed the benefits conferred by section 631(a) of the Internal Revenue Code of 1954 for all timber cut from its own land in the Seattle watershed. Scott did likewise. Beginning in 1958, however, Weyerhaeuser began to claim the benefit of this section for all of its one-half share of the timber cut pursuant to the above-described contractual arrangements, regardless of whether the timber was taken from its own land or from Scott's land. In its suit in the District Court, Weyerhaeuser then claimed refunds for the years 1956 and 1957 based on its new approach to treatment under this section of the timber cut pursuant to the Seattle contracts.[3] Since more timber was cut from Scott's land than from Weyerhaeuser's during those two years, the result of such treatment would be to allow Weyerhaeuser section 631(a) treatment on the cutting of more timber than that which was in fact cut from its own land. In contrast, Scott has continued to adhere to the position that it should obtain section 631(a) treatment for all timber cut from its own land, even though, under the contracts, it may actually receive less than that quantity of timber for its own use.

Section 631(a) of the 1954 Code provides, in part, as follows:

"(A) Election to consider cutting as sale or exchange.—If the taxpayer so elects on his return for a taxable year, the cutting of timber (for sale or for use in the taxpayer's trade or business) during such year by the taxpayer who owns, or has a contract right to cut, such timber (providing he has owned such timber or has held such contract right for a period of more than 6 months before the beginning of such year) shall be considered as a sale or exchange of such timber cut during such year. If such election has been made, gain or loss to the

---

3. Weyerhaeuser also originally challenged its 1954 and 1955 returns in this connection, but it later dismissed its action for those years. The statute of limitations had already barred the Government from reopening Scott's returns for those same years. Obviously, the Government would desire to reopen Scott's returns for a particular year were it held that Weyerhaeuser, rather than Scott, should have had the beneficial treatment of section 631(a) for the cutting of certain timber during that year.

taxpayer shall be recognized in an amount equal to the difference between the fair market value of such timber, and the adjusted basis for depletion of such timber in the hands of the taxpayer. Such fair market value shall be the fair market value as of the first day of the taxable year in which such timber is cut, and shall thereafter be considered as the cost of such timber to the taxpayer for all purposes for which such cost is a necessary factor."

We see that, in essence, the section allows certain gains realized upon the cutting of timber to be treated as capital gains under the general provisions of section 1231 of the Internal Revenue Code of 1954.

The District Court concluded: "As the proof on the controlling fact issues under * * * [this question] is in even balance without even slightly greater weight in favor of * * * [Weyerhaeuser's] position, the ruling of the Commissioner under review should not be reversed." While there is significant merit in the positions of both parties, we are convinced that the District Court reached the correct result.

Since it is clear that Weyerhaeuser was not the "owner" of the timber on Scott's land, as specified in section 631 (a), the principal issue is whether Weyerhaeuser had "a contract right to cut" the timber on Scott's land which was delivered to Weyerhaeuser, so that the cutting of that particular timber would confer section 631(a) benefits upon Weyerhaeuser, rather than upon Scott, the owner of the timber. The parties here agree, it appears, that only one of the two companies may obtain section 631(a) treatment from the cutting of any particular item of timber. While the statute does not specifically so provide, this follows, it would seem, from the fact that, within the contemplation of the statute, only one taxpayer should be held to have cut any specific timber. Thus the statute specifies "the cutting of timber * * * by the taxpayer who owns, or has a contract right to cut,

such timber * * *." If Weyerhaeuser does not, by reason of the Seattle contracts, have "a contract right to cut" the timber which is delivered to it from the watershed each year pursuant to the contractual arrangements, then it seems clearly to follow that any cutting on Scott's land is attributable to Scott, so that Scott would qualify under the statute as the owner of timber who cuts such timber either for sale (here pursuant to the contractual arrangements) or for use in its own business.

The Income Tax Regulations provide that "[i]n order to have a 'contract right to cut timber' within the meaning of section 631(a) * * *, a taxpayer must have a right to sell the timber cut under the contract on his own account or to use such cut timber in his trade or business." Treas.Reg. § 1.631–1(b) (1); accord, Carlen v. Commissioner of Internal Revenue, 220 F.2d 338 (9th Cir. 1955). In Revenue Ruling 58–295, 1958–1 Cum.Bull. 249, 250, the Commissioner further explained:

"To be entitled to the benefits of Section 631(a) of the Internal Revenue Code of 1954 as the holder of a 'contract right to cut,' a taxpayer must have acquired under such contract a *proprietary interest* in the timber which he cuts. * * * Where a taxpayer is granted a contractual right to cut and remove all or a described part of the merchantable timber on a particular tract of land, he has a proprietary interest in the timber *cut by him if at the time of the cutting* he has an *unrestricted right* to sell the logs or use them in his trade or business."

(Emphasis added.) Although it is clear that Weyerhaeuser possessed the specified "unrestricted right" after delivery of the timber to it by Mountain Tree Farm Company, we cannot agree that Weyerhaeuser possessed, "at the time of the cutting," the required "proprietary interest" in the timber which had been taken from Scott's land and delivered to Weyerhaeuser. Certain factual circumstances support the conclusion

that Weyerhaeuser did not *"at the time of the cutting * * * [have] an unrestricted right to sell the logs or use them in * * * [its] trade or business."* (Emphasis added.) These facts are:

(1) The contract between Weyerhaeuser and Scott specifically provided that each company was to retain full title to the timber taken from its land until such time as that timber was delivered to the other timber company by the operator.

(2) The logging contract between Weyerhaeuser, Scott, and Mountain Tree Farm Company carefully provided that each log cut by the operator should be branded in eight places with the brand of the company from whose land it had been cut. Furthermore, the logging contract also required that the operating company sort and measure as to quantity the various forest products removed from the land of each owner. These steps were designed, of course, to assure that Scott and Weyerhaeuser would each receive the full compensation to which it was entitled for timber which it contributed to the total pooled amount.

(3) It was not, in fact, Weyerhaeuser or its exclusive agent who cut the timber.[4]

■ Weyerhaeuser advances two principal arguments. The first is that Scott was not eligible for section 631(a) treatment for timber removed from its land and delivered to Weyerhaeuser and that, therefore, such treatment should be allowed Weyerhaeuser, since it is not argued by the Government that the arrangement between the two companies destroyed the rights which one of them

would otherwise have under the section. Weyerhaeuser reaches the conclusion that Scott is not entitled to the section's benefits on this timber because, as stated in its opening brief, "an unrestricted right to sell or use the logs was requisite for Section 631(a) benefits." Therefore, reasons Weyerhaeuser, since Scott is "excluded from enjoyment of that essential proprietary right with respect to * * * [Weyerhaeuser's] half of the Watershed timber," it follows that the section 631(a) benefits are possessed by Weyerhaeuser. There is an obvious flaw in this reasoning. Under the applicable Regulation, it is required that a taxpayer *who is not an owner* possess the specified unrestricted rights in the timber in order to fall within the ambit of section 631(a). This unrestricted-right requirement is stated to apply only to a taxpayer who claims under section 631(a) as one having a "contract right to cut." Nowhere is it provided that the *owner* of the timber, Scott in the instant situation, must also possess an unrestricted right to sell or use the logs. There is no basis, therefore, for Weyerhaeuser's major premise that Scott is necessarily precluded from obtaining section 631(a) benefits as to the timber which it clearly owned at the time of cutting.

■ Weyerhaeuser's second principal argument is that because it has had the benefit of the appreciation in value since 1946 of the timber it receives from Scott's land—by reason of the prices fixed in the 1946 contract—it should also be allowed the section 631(a) benefits for this same timber. Conceding, *arguendo,* that such a result would here be desirable, we cannot permit that con-

---

4. In its argument on this point, Weyerhaeuser has forcibly contended that Mountain Tree Farm Company was acting as Weyerhaeuser's agent when it cut that part of the timber from Scott's land which would eventually be delivered to Weyerhaeuser. Such a status could possibly exist, although it appears to us that the more logical inference in that regard would be that the operator, if it ever acted for either owner alone, acted at a particular time of cutting for the company on whose land it was then doing the logging. Apart from inference, a fair interpretation of the contract is that the owners intended that Mountain Tree Farm Company was not to be deemed the agent of either alone at any particular time, but rather was to be an independent entity acting for both owners at the time when it cut on the land of either.

sideration to control. As the Government has pointed out, for example, such would also be the situation if Scott had, in 1946, signed a long-term contract for delivery of timber to a manufacturer located in New York. Such an arrangement, often in the form of a "requirements" or "output" contract, is well known. It is clear that section 631(a) would not extend to such a contract; yet Weyerhaeuser's increase-in-value reasoning would be equally applicable.

[redacted] We conclude, therefore, that Weyerhaeuser did not, by reason of the 1946 arrangement for pooling of logs and forest products, obtain the section 631(a) benefits which it sought in the District Court. That part of the judgment of the District Court which is challenged in No. 21,834 is affirmed.

No. 21,834–A

The United States appeals from the decision in favor of Weyerhaeuser on the "First Question" considered by the District Court. This question involves the proper treatment of casualty losses suffered by Weyerhaeuser.

During the years 1954, 1955, 1956, and 1957, Weyerhaeuser suffered certain losses of property. The losses included the destruction of timber, plant facilities, machinery, equipment, and offices, all of which had been held for utilization in Weyerhaeuser's business for more than six months. The losses were caused by various destructive agencies, including fire, storms, blasts, and beetles. The losses were not insured.

Weyerhaeuser took the position that these losses were deductible from ordinary income under the general rule of section 165 of the Internal Revenue Code of 1954. The Internal Revenue Service took the position that the losses were also subject to section 1231(a) of the Code and were therefore deductible only as capital losses, since Weyerhaeuser's gains subject to section 1231(a) exceeded its losses subject to that section for each of the years in question.

During the particular years section 1231(a) provided as follows:

"(a) *General Rule.*—If during the taxable year, the recognized gains on sales or exchanges of property used in the trade or business, plus the recognized gains from the compulsory or involuntary conversion (as a result of destruction in whole or in part, theft or seizure, or in exercise of the power of requisition or condemnation or the threat or imminence thereof) of property used in the trade or business and capital assets held for more than 6 months into other property or money, exceed the recognized losses from such sales, exchanges, and conversions, such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months. If such gains do not exceed such losses, such gains and losses shall not be considered as gains and losses from sales or exchanges of capital assets. For purposes of this subsection—

"(1) in determining under this subsection whether gains exceed losses, the gains described therein shall be included only if and to the extent taken into account in computing gross income and the losses described therein shall be included only if and to the extent taken into account in computing taxable income, except that section 1211 shall not apply; and

"(2) losses upon the destruction, in whole or in part, theft or seizure, or requisition or condemnation of property used in the trade or business or capital assets held for more than 6 months shall be considered losses from a compulsory or involuntary conversion."

This section was first enacted, in substantially the same form, in 1942. Internal Revenue Code of 1939, § 117(j), Act of Oct. 21, 1942, ch. 619, § 151(b), 56 Stat. 846.

The Government's position is that during the years in issue section 1231(a) required that all casualty losses be set off against section 1231(a) gains, regardless of whether or not the losses were insured. In contrast, Weyer-

haeuser contends that the only casualty losses which must be set off against such gains are those which were insured losses, thus leaving uninsured losses to be deducted from ordinary income. In holding for Weyerhaeuser, the District Court relied upon the ·decision of the Tenth Circuit in *Maurer v. United States,* 284 F.2d 122 (10th Cir. 1960), wherein the court held that, as to uninsured losses of personal property during 1954, section 1231(a) casualty losses included only insured losses. Accord, *Oppenheimer v. United States,* 220 F. Supp. 194 (W.D.Mo.1963). In reaching this result, the *Maurer* court relied principally upon the fact that section 1231(a)(2) provides that casualty losses are to be treated as "losses from a compulsory or involuntary conversion," and in the main body of section 1231(a), it is stated that the section applies to "the compulsory or involuntary conversion * * * of [certain] property * * * *into other property or money* * * *.*" (Emphasis added.) Since uninsured losses do not result in a conversion "into other property or money," the *Maurer* court reasoned that the section was not intended to apply to uninsured losses.

In 1958 an additional sentence was added to section 1231(a), to be effective for years after December 31, 1957—that is, for years following those with which we are here concerned. This additional sentence reads:

"In the case of any property used in the trade or business and of any capital asset held for more than 6 months and held for the production of income, this subsection shall not apply to any loss, in respect of which the taxpayer is not compensated for by insurance in any amount, arising from fire, storm, shipwreck, or other casualty, or from theft."

Technical Amendments Act of 1958, § 49(a), P.L. 85–866, 72 Stat. 1606. It is to be noted that this amendment applied only to income-producing (including business) property, such as Weyerhaeuser's, and not to property held for personal use, although both types of property are generally covered by section 1231(a). Thus, for a limited purpose, the post-1958 statute distinguishes between the various types of property covered by the section. Prior to 1958, however, there was absolutely no basis in the section's language for drawing any such distinction.

■ In failing to include personal-use property in the 1958 amendment, Congress clearly evidenced its opinion that the amendment was necessary to accomplish, for taxable years beginning in 1958, the treatment of income-producing property which Weyerhaeuser here claims was already proper before the amendment. Or, to state this another way, Congress in 1958 obviously believed that the rule announced in *Maurer*—involving personal-use property losses [5] during the taxable year 1954—was not the pre-1958 law as to income-producing property. Yet, as pointed out above, no basis for distinction between income-producing and personal-use property existed prior to 1958. It is evident, therefore, that Congress in 1958, at least by implication, rejected the interpretation which had been placed upon the section by the *Maurer* court.

In any event, it is apparent, we think, that, since no other change was made by the 1958 amendment, the pre-1958 rule for all types of property covered by the section, including the income-producing type here in question, should be held to be the same as the post-1958 rule applicable to property held for personal use. The Fourth, Fifth, and Sixth Circuits have each concluded that the post-1958 rule for property held for personal use is that all losses, both insured and uninsured, are covered by section 1231(a). *Campbell v. Waggoner,* 370 F.2d 157 (5th Cir. 1966); *Chewning v. Commis-*

5. Although *Maurer* involved the uninsured loss of property held for personal use, the Tenth Circuit did not attempt to draw, for section 1231(a) purposes, any distinction between property held for personal use and income-producing property.

sioner, 363 F.2d 441 (4th Cir.), cert. denied, 385 U.S. 930, 87 S.Ct. 289, 17 L.Ed.2d 212 (1966); Morrison v. United States, 355 F.2d 218 (6th Cir.), cert. denied, 384 U.S. 986, 86 S.Ct. 1887, (1966). In reaching their conclusions that, as to property not covered by the 1958 amendment, section 1231(a)'s coverage extends to both insured and uninsured losses, each of these three courts of appeal specifically rejected the *Maurer* court's reasoning. The discussions in the *Morrison* and *Campbell* opinions on the point are particularly worthy of reference. We share the conviction that the *Maurer* court erred in its conclusion.

It is true that the plain language of the section, as originally enacted, is reasonably susceptible of both interpretations which have been placed upon it. In our view, however, the determinative factor is found in the Treasury Regulations dealing with this section. Prior to the 1958 amendment, the relevant portion of the Regulations for the 1954 Code provides:

> "*Involuntary conversion.*—For purposes of section 1231, the terms 'compulsory or involuntary conversion' and 'involuntary conversion' of property mean the conversion of property into money or other property as a result of complete or partial destruction, theft or seizure, or an exercise of the power of requisition or condemnation, or the threat or imminence thereof. Losses upon the complete or partial destruction, theft, seizure, requisition or condemnation of property are treated as losses upon an involuntary conversion *whether or not there is a conversion of the property into other*

*property or money.* For example, if a capital asset held for more than 6 months, with an adjusted basis of $400, is stolen, and the loss is not compensated for by insurance or otherwise, section 1231 applies to the $400 loss."

T.D. 6253, 1957–2 Cum.Bull. 547, 551 (emphasis added) (now Treas.Reg. § 1.1231–1(e)). While this particular Regulation was promulgated in 1957, it was expressly made effective for those years commencing after December 31, 1953, and this identical interpretation of the law has been fixed in the Treasury Regulations since 1943. T.D. 5217, 1943 Cum.Bull. 314, 317. The Supreme Court has written: "Treasury regulations and interpretations long continued without substantial change, applying to unamended or substantially reenacted statutes, are deemed to have received congressional approval and have the effect of law." Helvering v. Winmill, 305 U.S. 79, 83, 59 S.Ct. 45, 46, 83 L.Ed. 52 (1938) (footnote omitted); see cases cited in Morrison v. United States, 355 F.2d at 221. Therefore, when the predecessor to section 1231(a) under the Internal Revenue Code of 1939 was reenacted in substantially the same form as before, the interpretation expressed in the Regulations as early as 1943 should be held to have taken on the character of established law.[6] We think, too, that the force of the Regulations is strengthened by the fact that the 1958 amendment and its legislative history [7] clearly evidence Congressional intent in accord with the prior interpretation.

■ We conclude that prior to the 1958 amendment, section 1231(a) covered both insured and uninsured casualty

---

6. Although the *Maurer* court was cognizant of this Regulation and its history, it reasoned:

   "[E]ither the Regulation is clearly inconsistent with the terms of the statute and invalid, or else it is inapplicable in this particular situation. Since there is a presumption of the validity of a regulation which was in force when a statute was reenacted, as here, we

believe that it applies only to 'involuntary conversions.'"
Maurer v. United States, 284 F.2d at 124 (footnotes omitted). We do not find this reasoning persuasive, and Weyerhaeuser does not here rely upon it.

7. For an adequate review of this legislative history, see Campbell v. Waggoner, 370 F.2d at 159–160; Morrison v. United States, 355 F.2d at 221.

losses. The portion of the District Court's judgment which is challenged in No. 21,834–A is reversed.

Affirmed in part; Reversed in part.

VON DER HEYDT, District Judge (dissenting in part and concurring in part):

I regret that I cannot agree in the conclusion reached by my colleagues in cause 21,834.

Considered together, the agreements of the parties with each other and with Mountain Tree provide that Weyerhaeuser and Scott are to be equal partners in harvesting the timber. Part of the advantage to be shared is the appreciation in the value of the timber. Indirectly, I conclude, this must include section 631(a) benefits.

The intended efficiency of the joint logging operation would be defeated if Mountain Tree was required to cut precisely half the timber from each party's tract each year. That was the reason for the provision in the contract for equalization payments. I interpret the agreement to provide that Mountain Tree was not the agent of either party. Mountain Tree, obviously, could not claim 631(a) benefits since it did not have unlimited rights to dispose of the cut timber. Its function was to deliver, as nearly as possible, equal shares of the harvest to Scott and Weyerhaeuser. In this context, Mountain Tree must have been acting for both parties when it cut the trees, irrespective of which party "owned" the timber. Equalization of the harvest was determined after the logs were delivered and scaled.

Under these circumstances, I find both parties had a sufficient proprietary interest in the harvested timber to qualify under the "contract right to cut" test, as defined in the Treasury regulation and Revenue ruling. The cutting accomplished by Mountain Tree for both parties was to benefit each of them equally, and such benefits could only be determined after the trees were harvested. Section 631(a) benefits should apply to each party's gains actually earned. A holding which concludes otherwise results in an inequitable paradox, i. e., Scott claims benefits on gains actually earned by Weyerhaeuser.

I would reverse the judgment of the District Court in cause 21,834.

As to cause 21,834–A, I concur in the opinion as written.