## VIRGINIA ELECTRIC AND POWER COMPANY

### v.

### The UNITED STATES.

#### No. 109–66.

United States Court of Claims.

June 20, 1969.

H. Brice Graves, Richmond, Va., attorney of record, for plaintiff, E. Milton Farley, III, and Hunton, Williams, Gay, Powell & Gibson, Richmond, Va., of counsel.

Michael H. Singer, U. S. Dept. of Justice, Washington, D. C., with whom was Asst. Atty. Gen. Johnnie M. Walters, for defendant, Philip R. Miller and Joseph Kovner, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

### OPINION

PER CURIAM: *

The issues in this Federal income tax case (involving the calendar years 1959, 1960, and 1961) are: (1) whether the plaintiff-taxpayer, Virginia Electric and Power Company (Vepco), is entitled to depreciation deductions on its costs in-

---

* We are indebted to Trial Commissioner Lloyd Fletcher for his opinion and recommended conclusion of law which we adopt with minor modifications, except for our denial of rapid depreciation deductions for initial clearing costs.

curred for initial clearing of easements acquired and used for construction, maintenance, and operation of its transmission and distribution lines, and if so entitled, whether such costs qualify for the double declining balance method of depreciation; (2) whether Vepco is entitled to depreciation deductions on its costs of acquisition of such easements; and (3) if Vepco is entitled to depreciation deductions with respect to the assets described, what are their estimated useful lives?[1]

With one exception, identical issues are presented to the court in Pennsylvania Power & Light Company and Subsidiary Companies v. United States, Ct. Cl., 411 F.2d 1300. In that case, decided today, we held that Pennsylvania Power & Light Company's transmission and distribution easements, and its initial clearing costs thereof, were depreciable items, the useful lives of which could be estimated with reasonable accuracy.

Upon a careful study of that exhaustive opinion and the numerous authorities cited and analyzed therein, it is our judgment that the conclusion on this point in favor of the taxpayer is entirely correct for the reasons stated in that opinion. Merely to reiterate here that careful analysis of the basic issue would seem redundant and pretentious.[2] Therefore, since the main issue of whether the assets involved are depreciable items is identical in both cases, judgment is entered in favor of the taxpayer-utility.

The foregoing disposes of issues (1) and (2) above, except for the question of the applicable depreciation method which is discussed below. Consideration must now be given to issue (3), namely, a determination of the useful lives of the assets in question.

At the outset, we note the very important fact that the proof as to useful lives in the present case differs from that adduced in *Pennsylvania Power & Light Company*. In the latter case, as fully described in the opinion, the experts in property life analyses based their estimates of useful life on historical statistical studies using the "annual rate" and "geometric mean" methods in conjunction with the so-called "Iowa type survivor curves."[3]

Vepco's expert witnesses took a different approach. The statistical method above described was not ignored by Vepco, however. Indeed, in this respect the same expert, John J. Reilly, testified in behalf of both Vepco and Pennsylvania Power and Light Co. His studies of Vepco's plant and accounts resulted in an opinion that Vepco's transmission easement and initial clearing costs had useful lives of 100 years and that its distribution easements and initial clearing costs had useful lives of 50 years. However, Mr. Reilly qualified his opinion as to the above estimated service lives by stating that they were primarily ceiling figures to indicate an upper level of estimated lives. He testified that his "estimates would be too long" if, as he thought probable, Vepco's future retire-

1. A subsidiary issue relates to the amortization of emergency facilities by Vepco under certificates of necessity which provided that costs of easements and clearing with respect to such facilities were amortizable only if such assets qualify for the depreciation allowance under section 167 of the Internal Revenue Code. Since it is held that these assets do qualify for the depreciation allowance, it follows that amortization is allowable, and this issue is, therefore, moot.

2. To rewrite that opinion would be to invoke recollection of Judge Frank's jocular dictum: "Papa bring the hammer, there's a fly on baby's head." Wabash Corp. v. Ross Electric Corp., 187 F.2d 577, 595 (2d Cir., 1951).

3. This is not to say that, in reaching conclusions in this area, an engineer-analyst will rely merely on statistical computations and projections. He must also have extensive knowledge of the utility's overall electric plant and related facilities and information with respect to both the causes of property retirements in the past, and the likelihood that such retirements will continue or become more frequent in the future. See, Pennsylvania Power & Light Company, *supra*, 411 F.2d p. 1300

ment experience turned out to be more rapid than in the past, due both to technological improvements in underground cable construction and to the trend towards replacement of steam power plants by nuclear energy plants.

With this qualification in mind, Vepco produced expert testimony with respect to what may reasonably be expected in the area of future technological improvements and changes in operational techniques employed by electric utilities, in general, and by Vepco, in particular.

Vepco's assistant vice president, a well-qualified electrical engineer who has spent his entire career working on the problems of Vepco's transmission and distribution system, testified that there is substantial public concern over the appearance of overhead power lines, and this aesthetics problem is under active consideration. In his opinion, this public concern will force Vepco to replace its overhead facilities with underground cable in the foreseeable future.[4] Apart from the cost of such conversion to underground cable, the major problem confronting the industry today is the lack of suitable insulation for such cable. However, extensive research and experimentation in this area is underway both here and abroad, and in his opinion the problem of insulation will be solved with the result that transmission and distribution facilities will be placed underground in the predictable future. Such a development means that Vepco's easements for overhead facilities have a limited useful life because the easement agreements make no provision for any underground installations, and thus the conversion to underground cable would necessitate the acquisition of new easements and abandonment of the old. In his opinion, all Vepco's distribution lines will be underground somewhere between

the years 1990–2000, and all its transmission lines will be underground somewhere between the years 2020–2030.

Another expert witness for Vepco was Dr. Alexander Kusko, an eminent consulting engineer with very extensive academic, research, and industrial experience in the study of electric power system problems. He testified that, at the time of the years here involved, it was possible to make rational predictions with respect to the future development of the electric power systems in the heavily populated region of the Atlantic Seaboard, including that of Vepco. He made his predictions by decades for the period 1960 to 2000 and for the period 2000 to 2030.

The decade 1960 to 1970 he described as a decade of mine-mouth coal burning plants built close to coal mines in order to reduce the cost of fuel transportation. Their power output is transported by long extra high voltage overhead transmission lines. By the end of this decade, nuclear power generation will probably have become less expensive than fossil-fuel power generation, and, with the exception of some new hydroelectric generating stations constructed primarily in Canada, substantially all new generating plants should be operating on nuclear fuel after 1970.[5] Because of radiological dangers, these plants will be located away from cities, but near cooling water for volume cooling of their condensers. This will require massive overhead transmission lines to carry increased voltages of up to 1,000,000 volts.

In Dr. Kusko's opinion, Vepco's power system will probably change also by reason of other technological developments. With the expected increase in population will also come an increase in energy requirements. Voltages in the range of 1,000,000 to 2,000,000 volts, which is

---

4. One entire chapter of the 1965 Proceedings of the White House Conference on National Beauty is devoted to a consideration of the underground installation of utility systems; an extensive report on the subject was submitted to the Federal Power Commission in 1966; and bills

have been introduced in Congress to provide funds for research programs in the field.

5. At the time of trial Vepco had plans to build three nuclear energy plants to become operational in 1971, 1972, and 1974.

probably what will be necessary within the next 30 to 40 years, are difficult to handle by the present air insulation overhead lines. The development of a better insulation for both overhead and underground transmission will be necessary by the turn of the century. Such a development is under active research and experimentation.

Dr. Kusko further believes that, as atomic generation of electricity is proved to be safe, generating plants will no longer be constructed in isolated areas, but will be built in the heart of cities and near other load centers. This power system change will begin to take place in the decade of 1990 to 2000. No new overhead transmission lines will be constructed after 1990 because they would no longer have any function. The tremendous loads will require that generating plants be located in populated areas. It will probably be impractical to bring that type of power into such areas by overhead transmission lines. Plants will have to be brought to the load centers. In this same time period, heavy water and breeder type reactors, which reproduce their own fuel, will begin to replace the light water reactor plants constructed previously in order to conserve nuclear fuel.

On the basis of the above analysis, Dr. Kusko concluded that after 1970 it is reasonable to believe that electric distribution systems in cities and in surrounding populated areas will be constructed in underground cable. Furthermore, by the year 1990, all distribution circuits in densely populated areas will have been converted to underground cable, and by the year 2000, substantially all the distribution facilities of Vepco, wherever located, will be in underground cable.

As for the transmission system, Dr. Kusko concluded that all new transmission will be constructed in underground cable by the year 2000. Overhead lines built after 1970 carrying 500,000 to 1,000,000 volts will remain in operation, although portions of them will be replaced by cable as population grows into areas in which those lines are located. As stated previously, any new construction during this period will be close to load areas, not requiring extensive overhead transmission lines of the type earlier built. He concluded that by the year 2030 the last of the overhead lines built in the 1970 to 2000 period will have been retired.

In the Government's view, the foregoing constitutes merely some interesting crystal-ball gazing and does not rise to the stature of a "reasonable approximation" as required by the United States Supreme Court. Burnet v. Niagara Falls Brewing Co., 282 U.S. 648, 655, 51 S.Ct. 262, 75 L.Ed. 594 (1931). It will simply not do, however, to place Vepco's expert witnesses in the category of soothsayers. All were electrical engineers possessed of impressive qualifications and long experience in the electric power industry. Admittedly, the rather startling predictions by Dr. Kusko and Vepco's assistant vice president may not be fulfilled in precisely the manner and sequence to which they testified.[6] But precision in estimating useful life for purposes of the depreciation allowance is not required. The statements of Vepco's experts are sufficiently convincing that they may be classified as reasonable predictions of "probable future developments," which is all the regulations require in the context of this case. Treas. Reg. § 1.167(a)–1(b), 1956–1 C.B. 100. Indeed, the Supreme Court has held that the deduction may be based upon a "rough estimate." United States v. Ludey, 274 U.S. 295, 302, 47 S.Ct. 608, 71 L.Ed. 1054 (1927). Clearly, Vepco's ex-

6. "No one—not even the most brilliant scientist alive today—really knows where science is taking us. We are aboard a train which is gathering speed, racing down a track on which there are an unknown number of switches leading to unknown destinations. No single scientist is in the engine cab and there may be demons at the switches. Most of society is in the caboose looking backward." Lapp, The New Priesthood: The Scientific Elite and the Use of Power, Harper & Row, (1965) at p. 29.

pert testimony meets all of the applicable standards, and it is significant that the defendant made no effort to rebut the experts' predictions. We repeat again that the proof in this case is very different from the proof before the court in the *Pennsylvania Power & Light Co.* case, and we find different objective facts to be present in the two cases. Accordingly, it is our conclusion that Vepco has proved as of 1959 a useful life for its transmission easements and initial clearing costs of 71 years and a useful life for its distribution easements and initial clearing costs of 41 years.

Finally, there remains for consideration Vepco's contention that, being entitled to the depreciation allowance on its initial easement clearing costs, it may compute its deduction under the double declining balance method provided for in section 167(b) (2) of the 1954 Code which reads, in pertinent part:

(b) *Use of Certain Methods and Rates.*—For taxable years ending after December 31, 1953, the term "reasonable allowance" as used in subsection (a) [providing for the depreciation deduction] shall include (but shall not be limited to) an allowance computed in accordance with regulations prescribed by the Secretary or his delegate, under any of the following methods:

(1) the straight line method,

(2) the declining balance method, using a rate not exceeding twice the rate which would have been used had the annual allowance been computed under the method described in paragraph (1).

Subsection (c) of section 167 goes on to provide, in effect, and among other things, that the declining balance method of computing the allowance may not be used in the case of "intangible property." Defendant argues that Vepco's initial easement clearing costs are "intangible properties. Therefore, says tangibles" and hence do not qualify for the declining balance method. Vepco responds that the initial clearing costs are part of the costs of constructing the transmission and distribution lines themselves, the latter being obviously Vepco, since it elected for the years 1960 and 1961 to use the double declining balance method of depreciation for its transmission and distribution line construction, the initial clearing costs as a part of that construction also qualify for the double declining balance method.[7]

■ Both parties agree that the clearing costs are not an independent asset; rather they are a cost item which is included in the depreciable cost base either of the transmission and distribution lines or the cost base of the easements. Both parties also agree that the trial commissioner was inconsistent in permitting rapid depreciation but finding also that the useful lives of the clearing costs are those of the easements. We agree that this is an inconsistent result and, therefore, these costs should be included in the easement costs subject to depreciation over the useful lives of the easements, and not subject to rapid depreciation.

The useful life of an easement is not coterminous with the useful life of the first line to be placed on the easement because substitute lines may replace the initial line during the life of the easement. Initial clearing costs are incurred only once; yearly maintenance costs to keep the easement clear are deductible annually as operating expenses. That initial clearing cost, however, may not be exhausted over the life of the first line and, therefore, as the trial commissioner correctly held, the initial clearing costs are depreciable over the useful life of the easement, not the useful life of the line. When new lines are substitut-

---

7. A comparable problem was before the court in Panhandle Eastern Pipeline Co. v. United States, Ct.Cl., 408 F.2d 690 (decided March 14, 1969). Therein, the rapid depreciation issue involved certain rod-

dage fees paid to acquire the easements. We held that these were costs of the easement and intangibles, not subject to rapid depreciation.

ed, these initial clearing costs are not normally again incurred, and plaintiff has not proved that any part of these costs is exhausted over the life of the first line.[8]

Accordingly, we conclude that under the circumstances of this case and the proof before us, the only reasonable and consistent approach is to permit depreciation of the initial clearing costs as part of the easement costs, depreciable over the life of the easement together with other easement costs. As part of the easement cost, the initial clearing costs are considered intangibles and are not subject to rapid depreciation.

Therefore, in accordance with the above opinion, Vepco should have judgment entered in its favor, with the amount of recovery to be determined in accordance with Rule 47(c).

SKELTON, Judge (concurring in part and dissenting in part):

I respectfully dissent from that portion of the opinion that holds that as of 1959 the useful life for the transmission easements and initial clearing costs of Virginia Electric and Power Company, hereinafter called Vepco, is 71 years and the useful life of its distribution easements and initial clearing costs is 41 years. I believe that this holding is a discrimination against Pennsylvania Power and Light Company, hereinafter called the P. P. & L. Co., plaintiff in Ct. Cl., 411 F.2d 1300 decided today.

Both cases involve basically the same facts. Both companies manufacture and distribute electric power in a similar manner over territory similar in nature in the east coast area of the United States (Virginia and Pennsylvania, respectively) over electric power lines erected on poles over and along easements acquired by them from property owners. There is no practical difference between the manner of operation of the two companies. Both companies seek the same relief at the same time from this court, and, in my opinion, should be treated alike by the court. But this is not the case, because Vepco has received more favorable treatment at the hands of the court than has P. P. & L. Co.

It is true that the two cases were tried by two different commissioners of our court at different times.[1] However, both cases are before us at the same time. It is understandable that the commissioners may have reached different results on the problem at issue, because each of them tried his own case on the evidence before him in that case and based his decision thereon. This is not meant to be any criticism of the commissioners. With us, the situation is different. We are considering both cas-

---

8. Plaintiff relies on Portland General Electric Co. v. United States, 189 F.Supp. 290 (D.Or.1960), *aff'd on other issues*, 310 F.2d 877 (9th Cir. 1962), and Commonwealth Natural Gas Corp. v. United States, 266 F.Supp. 298 (E.D.Va.1966), aff'd, 395 F.2d 493 (4th Cir. 1968).

In the *Portland General Electric Co.* case the parties stipulated to the cost basis of depreciable property except for two items, one of which was "Costs of Rights of Way". In deciding that the costs of clearing rights of way were depreciable, the court held "these properties were depreciated over the useful lives of the properties with which the rights of way are associated. These costs are proper items to be made a part of the cost basis of PGE's depreciable properties." [189 F.Supp. at 306.]

In our case, the initial clearing costs are depreciable over the useful life of the *easements;* in the *PGE Co.* case, they were depreciable over the useful life of the properties placed on the easement. In *PGE* the court made these costs part of the base of the properties and depreciable together with them. In our case, these costs are part of the depreciable base of the easements. It is incongruous to consider these costs depreciable over the life of the easements, not an independent asset yet subject to rapid depreciation.

In the *Commonwealth Natural Gas Corp.* case, the useful lives of the pipeline and easement were coterminous, and the court found that the useful life of the clearing costs would be exhausted together with that of the pipeline. Here, the useful life of the clearing costs extends beyond the life of the initial line and, accordingly, we have not made these costs part of the depreciable base of the line.

1. Trial Commissioner Hogenson tried the P. P. & L. Co. case and Trial Commissioner Fletcher tried the Vepco case.

es together and we can make whatever findings of fact we think are appropriate that are supported by the records in both cases. The findings of the commissioners are presumptively correct under the rules of our court, but we are not bound by them.

When this is done, we find that the only difference in the evidence in the two cases is the testimony of certain experts in the Vepco case that because of advances in technology and practice in the industry, in a few years all overhead electric lines and modern electric generating plants would be out of date and would be replaced by underground lines and nuclear generating plants. On this testimony the commissioner concluded, and the majority of the court agree, that the useful life of the transmission easements and initial clearing costs of Vepco is 71 years, and that of its distribution easements and initial clearing costs is 41 years. This evidence was not before the commissioner in the P. P. & L. Co. case. The evidence in that case was to the effect that such useful lives are 100 years and 45 years, respectively, and the commissioner so found, and the majority agree.

It should be pointed out that an expert witness named John J. Reilly testified in both cases. His testimony was essentially the same in the two cases. He said in the P. P. & L. Co. case that the useful life of a transmission easement is 100 years and that of the clearing costs is 60 years, and the life of the distribution easement is 45 years and that of the clearing costs is 35 years. On this evidence, the commissioner and the majority hold that the useful life of the transmission easement is 100 years and that of the distribution easement is 45 years. The clearing costs were given the same useful lives as the easements (in both cases).

In the Vepco case, Mr. Reilly testified that the useful life of a transmission easement is 100 years (same as in the P. P. & L. Co. case) and that of the distribution easement is 50 years (5 years more than in the P. P. & L. Co. case).

His testimony was based on present conditions and without indulging in speculation as to future underground cable and nuclear plant developments. His evidence was the same in both cases as to the useful life of the transmission easements (100 years) and practically the same on the life of the distribution easements (5 years more in Vepco than in P. P. & L. Co.).

In my opinion, this evidence, based on present conditions, compels us to enter the same judgment in both cases as to the useful lives of these easements. But the majority has adjudged that the easements have the following useful lives:

1. In the P. P. & L. Co. case:
   Transmission easements .. 100 years
   Distribution easements .. 45 years
2. In the Vepco case:
   Transmission easements .. 71 years
   Distribution easements .. 41 years

The shorter lives for the easements in the Vepco case, as stated above, was arrived at on the testimony of certain experts (its Vice-president and a Dr. A. Kusko) as to the future developments in underground cables and nuclear generating plants. As a practical matter, these witnesses did not testify that these developments would occur only in Vepco's system, but testified with reference to Vepco and the industry in general. Consequently, from a theoretical standpoint, their testimony is as applicable to P. P. & L. Co. as to Vepco. In my opinion, this testimony was too speculative on which to base the opinion of this court. While their predictions may come to pass, on the other hand, as the government contends, their observations in this regard may be mere "crystal-ball" gazing. In any event, it occurs to me we need something more tangible on which we can base our judgment. If the developments these witnesses predict should materialize in the future, changes in the tax position of the taxpayers could be made at that time. As the majority say in the P. P. & L. Co. case:

* * * As stated by the Supreme Court, if what now appears to be rea-

sonable useful lives of such assets proves by further experience to be in error, administrative steps are readily available for a redetermination. * * *.

I do not believe we are justified in treating these two taxpayers differently on practically the same facts and issues. To do so is to prefer one over the other and to discriminate in favor of one and against the other.

I would hold that the useful lives of the easements in both cases are the same, as the court may determine. However, it would be preferable to fix the useful lives of the transmission easements at 100 years and that of the distribution easements at 45 years, because the testimony of the witness Reilly in *both* cases was to this effect, whereas, there is no evidence in the P. P. & L. Co. case that would support shorter lives for the easements.

COLLINS, Judge, joins in the foregoing opinion, concurring in part and dissenting in part.