## BADGER PIPE LINE COMPANY
### v.
### The UNITED STATES.
### Nos. 126–63, 95–64.

United States Court of Claims.
Oct. 18, 1968.

James W. Baldwin, attorney of record, Bartlesville, Okl., for plaintiff; Russell H. Smith and Jerry C. Reed, Tulsa, Okl., of counsel.

Donald T. Fish, Washington, D. C., with whom was Asst. Atty. Gen. Mitchell Rogovin, for defendant; Philip R. Miller and Theodore D. Peyser, Jr., Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

## OPINION

### PER CURIAM:

These cases were referred to Trial Commissioner George Willi with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 57 (a). The Commissioner has done so in an opinion and report filed on April 29, 1968. On May 28, 1968 defendant filed a notice of intention to except to the Commissioner's findings of fact and recommended conclusion of law. On August 12, 1968 defendant filed a notice of withdrawal of the notice to take such exceptions. On September 5, 1968 plaintiff filed a motion requesting the court to adopt the Commissioner's recommended opinion, findings, and conclusions of law. Since the court agrees with the Commissioner's opinion, findings, and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in these cases without oral argument. Plaintiff is, therefore, entitled to recover and judgment is entered for plaintiff with the amounts of recovery to be determined pursuant to Rule 47(c).

### OPINION OF COMMISSIONER

WILLI, Commissioner:

Plaintiff is a Delaware corporation whose sole business is the transportation of petroleum products by pipeline from refineries in the East Chicago, Indiana, area to Madison, Wisconsin, and various intermediate points enroute. The total system is approximately 266 miles in length. Except for a 66-mile segment acquired by purchase from the Sinclair Oil Company in 1955, the entire system was built by the plaintiff.

In the construction and operation of its underground pipeline system, it was necessary for the plaintiff to secure access to the lands of others. For this purpose, it secured right-of-way easement grants from the owners of property traversed by the system. Typically, these grants accorded plaintiff the right of access to construct, operate, maintain, and replace a pipeline. In some cases, the grants gave plaintiff the right to install additional lines upon payment of a stipulated fee, usually the same as that payable for the original line. By their terms, the easement grants continued in force for so long as the plaintiff maintained the lines that it installed pursuant to them.

For federal income tax purposes, the plaintiff capitalized the expenses that it incurred in acquiring the right-of-way easements. Foremost among such expenses were the so-called roddage fees paid property owners for the privilege of installing pipe under the surface of their lands. On its federal income tax returns for 1956 and 1958, plaintiff claimed depreciation and amortization [1] deductions

---

1. The amortization deductions involved in the years in suit stem from the Office of Defense Mobilization's issuance of accelerated amortization certificates to the plaintiff covering part of the cost of a portion of the system that it built.

in respect to the right-of-way acquisition costs that it had capitalized. Those costs aggregated $452,903.05 and $451,310.05 at the close of plaintiff's 1956 and 1958 tax years, respectively.

Following an audit of the plaintiff's returns, the Commissioner of Internal Revenue disallowed the claimed deductions. The resulting deficiencies were duly paid and timely refund claims thereafter filed. The refund claims were denied in due course and the instant suits were brought.[2]

As presented by the parties, the issue of the plaintiff's depreciation and amortization rights with respect to its easement acquisition costs turns on a single factual determination, i. e., whether the easement rights that the plaintiff acquired have a reasonably ascertainable useful life. The Commissioner of Internal Revenue concluded that they do not, and this conclusion was the sole basis for his disallowance of the claimed deductions for both depreciation and amortization.

■ For the reasons that follow, it is held that the plaintiff's capitalized right-of-way acquisition costs are depreciable because their value and life are directly related to and dependent upon the useful life of the pipeline to which they pertain. The Government has traditionally recognized[3] that pipe in a pipeline has a reasonably ascertainable life over which the cost of the pipe and its installation may be depreciated for tax purposes. On the facts presented in this record, the useful life of the related right-of-way

easements is coterminous with that of the pipe.

Section 167(a) of the Internal Revenue Code of 1954 authorizes a depreciation deduction in the amount of "a reasonable allowance for the exhaustion, wear and tear (including reasonable allowance for obsolescence) * * * of property used in the trade or business * * *."

The relevant interpretative Treasury Regulations[4] provide as follows with respect to the measure of the allowance and the requisite nature of the useful-life characteristics of the asset sought to be depreciated:

> *Useful life.* For the purpose of section 167 the estimated useful life of an asset is not necessarily the useful life inherent in the asset but is the period over which the asset may reasonably be expected to be useful to the taxpayer in his trade or business or in the production of his income. This period shall be determined by reference to his experience with similar property taking into account present conditions and probable future developments. * * * If the taxpayer's experience is inadequate, the general experience in the industry may be used until such time as the taxpayer's own experience forms an adequate basis for making the determination. * * *

■ The plaintiff's contention that the installation of pipe pursuant to a particular easement that has been obtained from a property owner transforms the easement right from an intangible asset to a tangible asset, is without merit.

---

The parties agree that the allowability of deductions for amortization, as distinguished from depreciation, presents no separate or different legal or factual issues. In both instances the plaintiff's deduction rights are solely dependent upon the useful-life characteristics of the easement rights that it obtained from property owners.

2. By an order under Rule 47(a) these suits were consolidated with Texas-New Mexico Pipe Line Co. v. United States and Texaco-Cities Service Pipe Line Co.

v. United States, 401 F.2d 796, for purposes of trial.

3. Bulletin "F" (Revised January 1942), Income Tax Depreciation and Obsolescence-Estimated Useful Lives and Depreciation Rates, p. 54, specifies useful lives of 25 and 40 years for gathering lines and trunk lines, respectively. Because it carries only refined petroleum products, plaintiff's entire system consists of trunk lines.

4. Section 1.167(a)-1(b), Treasury Regulations on Income Tax (1954 Code).

The right to install a pipe under the land of another is an intangible asset when obtained and the subsequent exercise of the right does not alter its intangible character. An easement is similar in nature to a license or franchise. As such it is an intangible asset. Kennecott Copper Corp. v. United States, 171 Ct.Cl. 580, 613–614, 347 F.2d 275, 294 (1965).

The Treasury Regulations deal specifically with the requirements governing depreciation of intangible assets. Section 1.167(a)–3 of the regulations provides in part:

> If an intangible asset is known from experience or other factors to be of use in the business * * * for only a limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance. * * *

Finally, the depreciation of pipeline right-of-way easement acquisition costs has been made the subject of a published Revenue ruling. Rev.Rul. 65–264, 1965–2 Cum.Bull. 53, provides in relevant part:

> * * * if the taxpayer can demonstrate in a particular case that certain easement acquisition costs will have a limited life because they will no longer be useful after the expiration of the useful life of a related pipeline, then such costs may be depreciated.

> The taxpayer must establish that the intangible assets will not be useful in the construction of additional pipelines. For this purpose, the term "additional pipelines" includes both looplines and any replacement pipeline in the same trench. * * *

The Government relies on two features of the right-of-way easements involved in these cases to establish its contention that the easements have useful lives of indeterminate duration. The first provision is common to all of the easements in issue. It gives the plaintiff the right to replace the pipe initially installed under the easement grant. The second feature relied on is that contained in approximately one-fifth of the easement indentures. In that distinct minority of instances, the plaintiff is given the right to install an additional line on the same right-of-way upon payment to the property owner of the same consideration specified in the agreement for installation of the original line.

That the literal scope of the easement indentures involved in these actions includes the pipe replacement and additional line rights attributed to plaintiff by the Government is not dispositive of the useful-life inquiry and hence the question of entitlement to depreciation.

It has long since been settled that taxation is an "intensely practical matter." Farmers Loan & Trust Co. v. Minn., 280 U.S. 204, 212, 50 S.Ct. 98, 74 L.Ed. 371 (1930); Burnet v. Sanford & Brooks Co., 282 U.S. 359, 51 S.Ct. 150, 75 L.Ed. 383 (1931).

The previously quoted Treasury Regulations emphasize the element of practicality in the availability and determination of depreciation allowances. Thus, the regulations dealing with depreciation generally speak in terms of useful life as being "the period over which the asset may *reasonably be expected to be useful* to the taxpayer in his trade or business." Further, the same regulations prescribe that a particular taxpayer should calculate useful life for his purposes "by reference to his experience with similar property taking into account present conditions and *probable* future developments." Finally, the regulations dealing specifically with depreciation of intangible assets authorize the allowance if useful life is of a determinate duration "which can be *estimated with reasonable accuracy.*" [Emphasis added.]

It is thus apparent from the Treasury's own interpretative pronouncements that the utility and longevity of the easement rights that this plaintiff secured from property owners must be gauged by realistic rather than theoretical considerations.

The evidence adduced in these cases overwhelmingly demonstrates the extreme unlikelihood that to any measura-

ble extent the value of the easement rights purchased by plaintiff for the installation of a particular pipeline will outlive that line. Viewed in realistic perspective, subsisting easement value beyond that point is so negligible as to be irrelevant to a useful-life determination for depreciation purposes.

■ To support its right to a depreciation allowance for easement acquisition costs consonant with that accorded the pipe related to such easements, the plaintiff need not prove to a mathematical certainty that the economic value of the easement rights will be totally exhausted on the expiration date of the useful life ascribed the pipe. Such weight of evidence as would reasonably support a verdict for a plaintiff in an ordinary action for the recovery of money fairly may be deemed sufficient. Burnet v. Niagara Falls Brewing Co., 282 U.S. 648, 654–655, 51 S.Ct. 262, 75 L.Ed. 594 (1931).

In rejecting the pipe replacement feature as a basis for denial of depreciation, the court recognizes both that the indentures in suit give the plaintiff the unqualified right to replace pipe and that there have been instances where pipeline carriers have effected a pipe size increase by replacement under indenture language similar to that involved here. See, e. g., Reid v. Washington Gas Light Co., 232 Md. 545, 194 A.2d 636 (1963), where a gas company replaced a 12-inch transmission line of unspecified length with a 16-inch line in the same trench.

The evidence in this record shows not only that the plaintiff has never effected any point-to-point replacement of pipe but that it would not be economically feasible for it to do so.

Continuity of service is the overriding concern and consideration in the design and operation of a transportation system such as plaintiff's. To increase transportation capacity between two service points by digging up an existing line and replacing it in the same trench with a larger one would inescapably entail an extended interruption of pipeline service

between those points. The understandable ill will of affected customers and the very real risk of permanent loss of their patronage are more than sufficient to relegate large-scale pipe replacement to the status of last resort in plaintiff's plans for increasing system capacity. Admittedly, there is the possibility that the best available overall routing for a new line would unavoidably involve a portion of that line traversing a heavily congested area that presented no reasonable alternative to utilization of an existing trench. That in such conceivable but infrequent circumstances the plaintiff could find itself constrained to exercise its pipe replacement privileges for a particular segment of a new and more efficient line, does not make the right of pipe replacement a relevant factor of general applicability in assessing the useful life of plaintiff's easement rights on a system-wide basis. Because of the service implications and economic consequences of any significant quantity of pipe replacement, it must be concluded that replacement rights are more abstract than real in the useful-life context.

With respect to the additional line right provision found in approximately one-fifth of plaintiff's easement indentures, the record in these cases discloses that again we are dealing with a matter of more theoretical than real dimensions where the question is resultant effect on useful life.

The Government's theory is that the useful life of an easement containing an additional line clause extends beyond that of the original line because the carrier has acquired not only the right to install that line but the right to install another one in the future on the same right-of-way upon payment of the same consideration as that specified for the first.

Whatever the conceptual appeal of the Government's argument, the facts in these cases show that the residual value of such additional line privileges as plaintiff secured in its original dealings with property owners is too inconsequential to measurably affect a useful-life

determination for the easements in question.

The uncontradicted evidence establishes the following facts regarding the plaintiff's easements with additional line rights.

In negotiating for an original easement, the plaintiff neither paid nor offered to pay more for an agreement that included additional line rights than one that did not. Although the standard form of easement indenture used by the plaintiff included a second line provision, it was stricken without further ado if the property owner objected to its inclusion. With the plaintiff negotiating in this manner, only 293 of its 1594 right-of-way agreements included additional line rights.

Because less than 20 percent of its easements include additional line clauses, it would be physically impossible for plaintiff to add a line between two service points by using only right-of-way privileges already in hand. Even if it used all of its additional line rights for such new construction, plaintiff would be obliged to secure new right-of-way agreements from the bulk of the property owners along the route. In such circumstances, it has been the plaintiff's invariable policy to pay the previously committed property owners the same rate of consideration as that paid their uncommitted neighbors even though such rate is in excess of that stipulated in the outstanding additional line clauses. It is in the plaintiff's interest to do this as a gesture of goodwill. The extra expense involved is minor and the preservation of good relations with all affected property owners is important because of the periodic necessity of going on their lands to perform repair and maintenance operations.

The evidence shows that the existence of second line rights has not influenced the routing of an additional line to be constructed between existing service points. This is true both because of plaintiff's practice of paying all property owners the going rate for a new line right-of-way and because of the insignificant portion of total construction costs that is represented by easement acquisition costs. In plaintiff's experience, such costs amounted to only 6–7 percent of total cost. Accordingly, when plaintiff increased its service capacity between Middlebury and Rockford, Illinois, a distance of 66 miles, by adding a 12-inch line to the existing 8-inch line, it used none of the additional line rights that it had acquired under the easements obtained for the original line.

In reality, it appears that the only discernible benefit derived by plaintiff from securing an additional line right is in the context of subsequent negotiations with the property owner or his assigns if and when the construction of another line is contemplated. At that juncture, the existence of such a right removes the possibility of having to resort to condemnation—a seldom-used procedure that is most unattractive to pipeline carriers generally from the standpoint of time, legal expense, and the creation of bad public relations. The possibility that in the future an additional line clause may assist plaintiff in avoiding a nuisance and inconvenience is not enough to vary the useful-life characteristics otherwise inherent in an easement grant for federal tax purposes.

For the reasons stated above, it is concluded that on the record in these cases the plaintiff has met the requirements of the statute, regulations, and interpretative ruling concerning its right to depreciate its easement acquisition costs. In the terms of the regulations and ruling, the plaintiff has shown that on the basis of "present conditions and probable future developments," the easements in question cannot "reasonably be expected to be useful," Treas.Reg. § 1.167(a)–1 (b), "after the expiration of the useful life of [the] related pipeline," Rev.Rul. 65–264, 1965–2 Cum.Bull. 53.

The Government has long recognized that trunkline pipe, fittings, and construction costs are capital items subject to depreciation. The Internal Revenue Service's Bulletin "F", applicable to the years in suit, estimates the useful life of

these items at 40 years. Fn. 3, supra. Though the Bulletin sets forth specific useful-life periods for a broad array of types and categories of depreciable assets, it expressly provides that "[t]he estimated useful lives and rates of depreciation * * * are based on averages and are not prescribed for use in any particular case." See also Massey Motors, Inc. v. United States, 364 U.S. 92, 101–102, 80 S.Ct. 1411, 4 L.Ed.2d 1592 (1960). Accordingly, the useful lives ascribed the easement acquisition costs here in suit need not conform literally with those prescribed in Bulletin "F" for trunkline pipe. The record shows that throughout its existence the plaintiff has depreciated the tangible components of its pipeline enumerated in Bulletin "F". On audit, the Revenue Service has considered and passed on the depreciation rates used by plaintiff for federal tax purposes with respect to its line pipe, fittings, and the like. The same rates should be applied to the capital costs of the easements that pertain to those admittedly depreciable items.

■ Plaintiff's suggestion that both its entitlement to depreciation of easement acquisition costs and the period over which such costs may be depreciated should be governed by the treatment accorded those expenditures by the ICC in its regulatory capacity, is without merit. Old Colony R. R. v. Commissioner, 284 U.S. 552, 562, 52 S.Ct. 211, 76 L.Ed. 484 (1932). The record in these cases shows only the ultimate fact that the Commission allowed a write-off at a specified annual rate. It reveals nothing of the purpose for which the allowance was approved or of the legal or factual considerations underpinning the Commission's action. All that does affirmatively appear is that in making its determinations the Commission did not have before it any of the easement indentures involved in these suits.

The depreciation issue here involved has been decided in three reported cases. In Northern Natural Gas Co. v. O'Malley, 277 F.2d 128 (8th Cir. 1960), and Commonwealth Natural Gas Corp. v. United States, 266 F.Supp. 298 (E.D.Va. 1966), it was held that the useful life of pipeline easements was determinable by reference to the projected quantity of mineral reserves (in those cases, gas) from which the transmission lines drew their supply. These decisions are inapposite here since the plaintiff's system transports only refined products, not crude oil. It therefore makes no claim that oil reserves have a bearing on the useful life of its properties.

More in point is Shell Pipe Line Corp. v. United States, 267 F.Supp. 1014 (S.D. Tex.1967), where a carrier of both crude oil and refined products contended that the useful life of its easements was coextensive with that of the pipe to which they related. Although the court decided that the easements in question were useful to the taxpayer for only a limited time and were therefore depreciable, it did not fix their useful life by reference to that of the line to which they pertained. For reasons that do not appear in the opinion, the court reserved the latter question for further proceedings. Shell Pipe Line Corp. v. United States, supra, 267 F.Supp., at 1016. In any event, it does appear that the holding in Shell is in conceptual harmony with the decision reached here; the decision being that the useful life of plaintiff's easements is the same as that of the installed pipe for which they were acquired, with the cost thereof to be depreciated at the same rate as has been established and applied by the parties for the related pipe. To the extent that the Office of Defense Mobilization certification is involved, such depreciation will be at the accelerated rate specified in the certification. Fn. 1, supra.