**PENNSYLVANIA POWER & LIGHT COMPANY and Subsidiary Companies**

v.

**The UNITED STATES.**

**No. 220-64.**

United States Court of Claims.

June 20, 1969.

Norton Kern, New York City, attorney of record, for plaintiff, Reid & Priest, Thomas C. Kent, and Lawrence C. Wilson, New York City, of counsel.

Michael H. Singer, U. S. Dept. of Justice, Washington, D. C., with whom was Asst. Atty. Gen. Johnnie M. Walters for defendant, Philip R. Miller and Joseph Kovner, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION

PER CURIAM *:

This is a timely suit for recovery of Federal income taxes paid by plaintiff Pennsylvania Power & Light Company on its separate corporation returns for the calendar years 1951, 1952, and 1953, and paid by such plaintiff and its subsidiaries on their consolidated returns for the calendar years 1954 and 1955.

The aggregate recovery sought is $761,414.04, plus statutory interest. Except as the context indicates otherwise, the singular term "taxpayer" is used to refer to such plaintiff and its subsidiaries.

Taxpayer is and was a Pennsylvania corporation engaged in the production, transmission, distribution, and sale of electric energy in Pennsylvania under rates subject to regulation by the Pennsylvania Public Utility Commission.

The issues in this care are: (1) whether taxpayer is entitled to depreciation allowance deductions on its costs incurred for initial clearing of easement rights-of-way acquired and used for construction, maintenance, and operation of its transmission and distribution lines; (2) whether taxpayer is entitled to depreciation allowance deductions on its costs of acquisition of such easements; and (3) whether taxpayer is entitled to deduct the full amounts of its uninsured casualty losses incurred in taxable years 1954 and 1955 from ordinary income, or whether under section 1231 of the Internal Revenue Code of 1954, only the amounts of such losses in excess of gains are deductible from ordinary income.

For the reasons hereinafter stated, it is our opinion that plaintiffs are entitled to recover on the first two issues stated above, but are not entitled to recover on the third issue.

As its primary source of electric energy, taxpayer operated steam and hydroelectric powerplants, and as a secondary source, had pooling and interchange agreements with other electric power companies. Electric power generated or purchased by taxpayer is and was marketed to industrial, commercial, governmental and residential consumers over transmission and distribution lines, which consist of conductors (wires), poles or towers, insulators and switches, and related items. About 99 percent of such lines were located on easement

---

* We are indebted to Trial Commissioner Roald A. Hogenson for his opinion and recommended conclusion of law, which we adopt, with modifications.

rights-of-way. Infrequently, taxpayer acquires and did acquire the entire fee from the landowner for such purposes, but does not claim herein the right to depreciation of any such land. Its transmission lines carry up to 500,000 volts of power from generating stations to transformer substations located in general areas of use. Its distribution lines then carry 12,000 volts, or less, from the substations to the customer with the electric power delivered at utilization voltage.

Taxpayer acquired such easement rights-of-way from the fee owners of the lands they traversed. The landowner retained the right to continue productive use of the land included within the easement. Such easements varied from the widest at several hundred feet on which several lines could be built to the narrowest of unspecified width on which one line could be constructed and maintained. For example, one transmission line easement was a two-line right-of-way 100 feet wide across clear land, expanded to 150 feet through timberland. Taxpayer's easements covered long and narrow strips of land.

Each of such easements grant and did grant taxpayer the right to construct, reconstruct, maintain, and operate one or more electric lines, as specified, with the right to clear and maintain such easement as necessary. Each contained no termination date, but continued or will continue in force and effect as long as a line is maintained thereon. It is undisputed that under Pennsylvania law, prevailing at all times relevant in this case, an easement right-of-way is extinguished or terminated by abandonment or cessation of use. Whenever taxpayer removed transmission or distribution lines without intention to reconstruct lines over the same right-of-way, it intended to and did abandon the pertinent easements and associated clearing costs. When taxpayer discontinued the use of an existing line, but intended to retain the easement for future use or construction, it left the unenergized line in place. No compensation was received by tax-payer on the abandonment of an easement, even in instances when taxpayer by written instrument (then only at the request of the landowner) released and abandoned the easement to clear record title.

In order to accomplish the intended use of an easement right-of-way, taxpayer first cleared and removed trees, bushes, and other impediments therefrom. This initial work not only removed hazards to the continuous operation of the line to be constructed, but reasonably facilitated the movement of men and equipment along the right-of-way for both construction and later maintenance. During operation of a line, taxpayer incurred further clearing costs as required, but such costs were treated as current expenses, deductible as such, and not capitalized. Initial clearing costs were capitalized.

As the trial commissioner found: "Since taxpayer retires and has retired component parts of transmission and distribution lines, such as conductors (wires) and poles, separately, as well as at the time when a section of a line is entirely retired, the initial clearing costs cannot be readily equated to the useful life of the powerline as originally installed."

More difficult is the question whether or not taxpayer is entitled to depreciate its cost of acquisition of transmission and distribution easements as part of its depreciable properties. The major items of such costs, capitalized by taxpayer, were consideration paid to the landowners, salary and travel expenses of right-of-way agent, legal and appraisal fees, transfer taxes, and recording fees. In its tax returns, taxpayer did not include an allowance for depreciation in respect of such costs, but claimed deductions in accordance with its accounting practice for Federal income tax purposes of writing such costs off its books when an easement was retired. This issue is presented for taxable years 1952 through 1955, since only for those years did taxpayer's claims for refund assert such ground for recovery.

Taxpayer's first contention is that its right-of-way easements are "integral" parts of its transmission and distribution facilities, and, as such, subject to an allowance of depreciation. There can be no doubt that (1) such easements were essential to the construction, maintenance, and operation of the powerlines, and that (2) the lines were necessary parts of taxpayer's overall electric plant and facilities. Furthermore, there is no contest concerning the validity of taxpayer's consistent practice of including costs of construction of its powerlines in the aggregate of its depreciable properties for application of a composite depreciation rate pursuant to the composite method of computing depreciation. In other words, it is not disputed that the powerlines are depreciable property. However, when taxpayer on infrequent occasions constructs such a line on its land owned in fee, such land is not depreciable, even though it is essential to the construction, maintenance, and operation of that particular line. Consequently, more is required than a determination that the easements are essential to the existence of depreciable property.

Defendant contended at the trial of this case (in the alternative to its position that the easements had indeterminate useful lives) that such easements are basically land, and land is not depreciable property. This contention is deemed abandoned because not thereafter made either in defendant's formal brief or in its oral arguments to the trial commissioner. As contended by defendant in its brief and subsequent oral arguments, it is concluded that the right-of-way easements are intangible assets. Panhandle Eastern Pipeline Co. v. United States, 408 F.2d 690 (decided March 14, 1969); Commonwealth Natural Gas Corp. v. United States, 395 F.2d 493 (4th Cir. 1968); Shell Pipe Line Corp. v. United States, 267 F.Supp. 1014, 1018 (S.D.Tex.1967).

The statutory authority for allowance of depreciation for the taxable years 1952 and 1953 is section 23($l$) of the Internal Revenue Code of 1939, 53 Stat. 14, 26 U.S.C. § 23($l$) (1952); and for the taxable years 1954 and 1955, section 167(a) of the Internal Revenue Code of 1954, 68A Stat. 51, 26 U.S.C. § 167(a) (Supp. II, 1952). Both Code sections provide that there shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear of property used in the trade or business, including a reasonable allowance for obsolescence.

The applicable Treasury Regulations for the taxable years 1952 and 1953 are Treas.Reg. 118, § 39.23(1)–1 to –3, 1953–2 Cum.Bull. 500, 26 C.F.R. (Part 39) § 39.23(1)–1 to –3(1953); and for taxable years 1954 and 1955, Treas.Reg. § 1.167(a)–1 to –3, 1956–1 Cum.Bull. 98. They provide that the allowance for depreciation is that amount which should be set aside for the taxable year in accordance with a reasonably consistent plan so that the aggregate of the amounts set aside, plus the salvage, will at the end of the estimated useful life of the depreciable property, equal the cost or other basis of the property. The estimated useful life of an asset is not necessarily its inherent physical life, but rather the period over which the asset may reasonably be expected to be useful in the taxpayer's trade or business. This period is determined by reference to taxpayer's experience with similar property taking into account present conditions and probable future development. Some of the factors to be considered in determining this period are (1) wear and tear and decay or decline from natural causes (2) the normal progress of the art, economic changes, inventions, and current developments within the industry and the taxpayer's trade or business, and (3) the taxpayer's policy as to repairs, renewals, and replacements. If the taxpayer's experience is inadequate, the general experience in the industry may be used to determine the estimated useful life.

As provided in the above-cited regulations, depreciation allowance on tangible property applies to that part of

the property which is subject to wear and tear, to decay or decline from natural causes, to exhaustion, or to obsolescence; and an intangible asset may be depreciated under such regulations if it is known from experience or other factors to be of use in the business for only a limited period, the length of which can be estimated with reasonable accuracy.

Thus, the basic question in this case on this issue is whether taxpayer has established by a preponderance of the evidence that its easements (intangible assets) will be useful in its business for a limited period, estimated with reasonable accuracy. Taxpayer has made no effort to show that each easement has a useful life limited to the useful life of the original powerline constructed and maintained thereon, and it is not established that the termination of the useful life of any existing powerline will necessarily result in abandonment or retirement of its related easement. In other words, there is no evidence that the costs of removal of an obsolete or worn out powerline and construction of a replacement line on the same easement would make such a practice economically prohibitive, and thus require abandonment of that easement when the useful life of its original powerline terminated. In fact, taxpayer's practice is at least in some instances to keep an unenergized line in place in order to retain the easement for some future replacement of the line. Furthermore, the actual life of the original powerline is sometimes extended by replacement of component parts. Also, there is no evidence that the easements are in any way affected as to their useful lives by any possible exhaustion of supply of electric energy to be transmitted and distributed over the lines. In these respects, the instant case differs factually from Badger Pipe Line Co. v. United States, 401 F.2d 799, 185 Ct.Cl. 547 (1968), in which it was found that the useful lives of easements and their related pipelines (for transportation of refined petroleum products) were coterminous because replacement of an obsolete or worn out pipeline on

the same right-of-way would not be economically feasible; and also from Commonwealth Natural Gas Corp. v. United States, *supra*, in which easement rights-of-way containing natural gas pipelines were held to have 30-year useful lives because such period was a reasonable measure of the life of the natural gas reserves available to the taxpayer for the taxable years in question. *See also*, Panhandle Eastern Pipeline Co., *supra*. The striking difference between the *Panhandle* decision and this case is that in the former plaintiff proved that the easement and the pipeline had coterminous useful lives. Both exhausted simultaneously.

In this case, however, the useful life of the easement extends beyond the life of the initial power line. There is a possibility that other transmission or distribution lines will be substituted for the initial line. In the *Panhandle* case, however, the proof showed that the initial pipeline placed on the easement was not replaced by substitute pipelines.

However, merely because the equating of the life of an easement to the life of its related pipeline may be relatively precise, it does not follow that taxpayer's estimates of the lives of its powerline easements are invalid as a matter of fact or law. Furthermore, it is obvious that the problem of estimating the life of natural gas reserves available to the taxpayer in Commonwealth Natural Gas Corp., *supra*, i. e., its fair share of all such reserves available or discovered east of the Rocky Mountains, is one of extreme complexity, necessarily requiring exercise of judgment by competent professionals who might well reach widely varying opinions. The Fourth Circuit Court of Appeals recognized and rejected impreciseness as a reason for reversing the lower court's ultimate finding as to the useful life of the pipeline easements involved. Commonwealth Natural Gas Corp. v. United States, *supra*.

Recognizing that the purpose of depreciation allowance was to return the costs of exhausting assets to the taxpay-

er over the useful lives of such assets in taxpayer's trade or business, and holding that in essence, the deduction for depletion did not differ from the deduction for depreciation, the Supreme Court in United States v. Ludey, 274 U.S. 295, 47 S.Ct. 608, 71 L.Ed. 1054 (1927), ruled that as intended by Congress, a "rough estimate" of the depletion deduction on an oil reserve was to be made, rather than ignore the fact of depletion. The established facts were that the quantity originally in the reserve was not actually known, could not be measured, but at best approximated, and consequently the percentage of the whole reserve withdrawn in any year was necessarily a "rough estimate." Thereafter, in Burnet v. Niagara Falls Brewing Co., 282 U.S. 648, 654–655, 51 S.Ct. 262, 75 L.Ed. 594 (1931), the Supreme Court held that it would be unreasonable and in violation of the statutory purpose to ascertain taxable income in each year, to put upon the taxpayer the burden of proving to a "reasonable certainty" the existence and amount of obsolescence of plant, but all that is required is a "reasonable approximation" of the amount that may be fairly included in the deduction for obsolescence. Citing United States v. Ludey, *supra*, the Supreme Court in Massey Motors, Inc. v. United States, 364 U.S. 92, 80 S.Ct. 1411, 4 L.Ed.2d 1592 (1960), reiterated the principle that the primary purpose of depreciation accounting is to further the integrity of periodic income statements by making a meaningful allocation of the cost entailed in the use of the asset to the periods to which it contributes to production of income, and observed with respect to rental cars involved, that there were risks of error in the projections or estimates of the periods such assets would be held in the business and the prices received for them on their retirement, but stated that "prediction" is the very essence of depreciation accounting. The holding was that the reasonable allowance for depreciation of the property was to be calculated over the estimated useful life of the asset while employed by the taxpayer, applying a depreciation base of the cost of the property to the taxpayer less its resale value at the estimated time of disposal. In commenting on the possibility of error where "probabilities" are relied upon to produce what is hoped to be an accurate estimation of the expense involved in utilizing the asset, the court observed that to insure a correct depreciation base in the years after a mistake has been discovered, adjustments may be made when it appears that a miscalculation has been made. Obviously the court was referring to challenge of subsequent returns by the Internal Revenue Service in well-known administrative procedures available. See also, Hertz Corp. v. United States, 364 U.S. 122, 80 S.Ct. 1420, 4 L.Ed.2d 1603 (1960); and also, Fribourg Navigation Co. v. Commissioner of Internal Revenue, 383 U.S. 272, 86 S.Ct. 862, 15 L.Ed.2d 751 (1966), citing *Ludey, Massey,* and *Hertz,* with approval.

■ Taxpayer submitted depreciation studies to the Pennsylvania Public Utility Commission in connection with proceedings which resulted in orders being issued by such Commission in 1952 and 1956, which established the rates taxpayer could charge for electric energy supplied to its customers. Such studies showed useful lives for the assets involved in this case, computed under the geometric mean method of analysis, and accepted by the Commission, as follows:

| Asset | Useful life in years | |
| | 1952 order | 1956 order |
|---|---|---|
| Transmission easements | 100 | 100 |
| Distribution easements | 50 | 40 |
| Initial cost of clearing transmission easements | 100 | 75 |
| Initial cost of clearing distribution easements | 50 | 40 |

While methods of accounting approved by such a regulatory body are not binding upon the Internal Revenue Service or the courts in tax cases, Old Colony R. R. v. Commissioner of Internal Revenue, 284 U.S. 552, 562, 52 S.Ct. 211, 76 L.Ed. 484 (1932), nevertheless such regulatory action has probative value in an appropriate case, such as the instant one. Northern Natural Gas Co. v. O'Malley, 277 F.2d 128, 137–138 (8th Cir. 1960); Portland General Electric Co. v. United States, 189 F.Supp. 290, 298 (D.C.Ore. 1960). Not only were the same items involved herein before the Pennsylvania regulatory body, but at times on either end of the period of taxable years involved herein, and in addition, taxpayer's expert witness on the useful lives of such assets in this case, Mr. John J. Reilly, participated as a consultant in the preparation of the studies submitted to the Pennsylvania agency.

Dr. Harold A. Cowles, Professor of Industrial Engineering at Iowa State University, an expert in the field of engineering valuation, depreciation, and property life analysis, and Mr. John J. Reilly, a consulting engineer, who during 30 years of experience had made or directed approximately 80 depreciation studies for more than 40 public utility clients, were the expert witnesses who testified on behalf of taxpayer herein. *The defendant presented no expert witness in rebuttal of their testimony.*

Dr. Cowles explained in detail the "actuarial" and "turnover" methods used in determining the useful lives of mass property accounts, the two primary categories of methods being used. The basic difference is that for the various actuarial methods, data must be available as to the original date of installation of items of property which have been retired from service, whereas no such information is required to apply the turnover methods. One accepted form of the actuarial methods is the "annual rate" method, and the "geometric mean" method is an accepted form of the turnover methods. Dr. Cowles testified that either the annual rate or the geometric

mean method could aid in producing a reasonable prediction of the estimated lives of a mass property account when the results are interpreted by a competent engineer who is familiar with the properties which are the subject of the study. Dr. Cowles had reviewed the data received in evidence relating to the additions and retirements of taxpayer's property accounts in issue, and testified that they were adequate to enable a competent engineer to determine reasonably the estimated lives of the properties of such accounts. Dr. Cowles explained the Iowa type survivor curves, developed in studies and research conducted at his university for many years. They are widely used in property life analysis in the public utility field.

Mr. Reilly's opinion as to the useful lives of the assets in issue in this case was 100 years for transmission easements, 45 years for distribution easements, 60 years for initial cost of clearing transmission easements, and 35 years for initial cost of clearing distribution easements. Mr. Reilly applied the geometric mean method to each of taxpayer's pertinent accounts. In addition, because of available data, he applied the annual rate method to taxpayer's transmission easement and clearing accounts, employing the Iowa type survivor curves. He considered information concerning the causes of the retirements of the pertinent properties and also the likelihood that such retirements would continue and become more frequent in the future. In reaching his opinion, he relied upon his extensive knowledge of taxpayer's overall electric plant and facilities, acquired in connection with his services as a consultant for taxpayer in connection with the 1952 and 1956 proceedings before the Pennsylvania Public Utility Commission, including a 2-month inspection in 1954 of taxpayer's entire system. We note, at this point, that the testimony before the court in this case is different from that presented to us in the case of Virginia Electric and Power Company v. United States, Ct.Cl., 411 F.2d 1314, decided today. Accordingly,

on the basis of different proof we reach a different conclusion as to the appropriate useful life for these easements in this taxpayer's trade or business.

■ Upon careful review of the testimony of taxpayer's expert witnesses, considered in the light of all of the evidence in this case, it is concluded that the pertinent properties are exhausting assets, and that taxpayer has established with reasonable accuracy the useful lives of its right-of-way easements, as follows:

Transmission right-of-way easements .....................100 years
Distribution right-of-way easements ...................... 45 years

On the basis of such useful lives, taxpayer is entitled to include in the aggregate of its depreciable properties for application of a composite rate of depreciation pursuant to the composite method of computing depreciation, its costs of acquisition of its easements. It is concluded from all of the evidence that this will more accurately reflect income in accordance with the principle that taxable income for each taxable year should be ascertained by meaningful allocation of costs of use of assets employed in the trade or business. It is undisputed that the reasons for retirement of taxpayer's easements have resulted in increased retirements of powerlines since 1955 because of growth of population, industrial expansion, and technological improvements in methods of operation of electric utilities. Furthermore, it is reasonable to predict, as does taxpayer, that such retirements will increase in the future. The drastic changes which have occurred since the first light globe of Thomas A. Edison suggest strongly that substantial technological developments will occur in the future. While the subject is not mentioned in the record of this case, this court cannot ignore the commonly-advanced prospect that development of use of nuclear energy could well result in a revolutionary change in the generation, transmission, and distribution of electric energy, whether to the advantage or disadvantage of this taxpayer. Taxpayer operates a fast-growing business, and it seems clear that if taxpayer is compelled to continue to defer the writing off of the pertinent capital costs until actual retirement of each easement, there will have been accomplished from year to year and over a substantial period of time, a distortion of the application of the capital costs of such assets in effecting the annual income accounting principle of the income tax laws. There is the distinct probability that technological and other changes could accelerate to the point that writeoff of such costs only at the time of easement retirements could result in concentration of such deductions in a relatively short period of time. Despite the impreciseness of taxpayer's estimates of useful lives, they are reasonable, and their application will result in spreading the recapture of the pertinent capital costs over the very substantial periods of time above-stated. The fact that taxpayer has not established a useful life for each of its easements and for each item of initial clearing costs, but rather a useful life for the mass properties in each of the pertinent accounts, does not detract from the reasonableness of its estimates. Some easements and initial clearing costs may survive, while others will terminate before the expiration of such estimated useful lives. The unreasonable conclusion would be to equate these easements and clearing costs to fee-owned land, presumed to last forever at a steadily appreciating value. As stated by the Supreme Court, if what now appears to be reasonable useful lives of such assets proves by further experience to be in error, administrative steps are readily available for a redetermination. Our trial commissioner found

that the initial clearing costs had an independent useful life, apart from the easements and transmission lines. As we held in the *VEPCO* case, initial clearing costs are not independent assets and they are subject to depreciation as part of the cost basis of the easements, over the useful life of the easement. For the reasons stated in the *VEPCO* decision, we find, on the records in these cases, that clearing costs are depreciated over the useful life of the easement, and that they do not have independent useful lives for the purpose of computing the depreciation deduction. Initial clearing costs are not separate assets and they exhaust together with the transmission and distribution lines easements, over the useful lives of such easements.

Taxpayer is entitled to recover on this issue in accordance with the foregoing opinion.

The remaining issue in this case is whether taxpayer is entitled to deduct the full amounts of its uninsured casualty losses incurred in taxable years 1954 and 1955 from ordinary income, or whether under section 1231 of the Internal Revenue Code of 1954, only the amounts of such losses in excess of gains are deductible from ordinary income.

In 1954 and 1955, taxpayer sustained uninsured casualty losses to real property and depreciable property used in its business in the respective amounts of $673,641.44 and $567,558.37 from a wind and rain storm in 1954 and a flood in 1955. In the same years, taxpayer realized gains on the sales of real property and depreciable property used for more than 6 months in its business, in the respective amounts of $75,460.71 and $67,177.89. For each year, taxpayer's timely claim for refund asserted the right to a deduction of the entire casualty loss from ordinary income without offset of the above-stated gains realized in that year. This ground for refund having been disallowed for both taxable years by the Internal Revenue Service, taxpayer by its timely petition filed herein seeks recovery for each year for the same reason asserted administratively.

Section 165(a) of the Internal Revenue Code of 1954, 26 U.S.C. § 165(a) (Supp. IV, 1952), provides:

§ 165. Losses. (a) General rule. There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.

Plaintiff's position is that this section plainly provides for the deduction of its losses not compensated for by insurance, and that offsets of its gains were not provided for under § 1231(a) of the 1954 Code, as follows:

§ 1231. Property used in the trade or business and involuntary conversions. (a) General rule.

If, during the taxable year, the *recognized gains* on sales or exchanges of property used in the trade or business, plus the *recognized gains from the* compulsory or *involuntary conversion (as a result of destruction in whole or in part*, theft or seizure, or an exercise of the power of requisition or condemnation or the threat or imminence thereof) of *property* used in the trade or business and capital assets held for more than 6 months *into other property or money*, exceed the recognized losses from *such* sales, exchanges, and *conversions*, such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months. If such gains do not exceed such losses, such gains and losses shall not be considered as gains and losses from sales or exchanges of capital assets. For purposes of this subsection—

\* \* \* \* \* \*

(2) losses upon the destruction, in whole or in part, theft or seizure, or requisition or condemnation of property used in the trade or business or capital assets held for more than 6 months shall be considered losses from a compulsory or involuntary conversion. [Emphasis added]

Taxpayer argues that this section is clearly and unambiguously limited to recognized gains and losses from the "compulsory or involuntary conversion (as a result of destruction in whole or in part, * * *) of property * * * into other property or money," and that uninsured casualty losses are not included therein. Since taxpayer's property losses by storm or flood were not compensated for by insurance, there was no conversion of property into "other property or money."

The statutory predecessor of § 1231(a) was § 117(j) (2) of the Internal Revenue Code of 1939, 26 U.S.C. § 117(j) (2) (1952), added to the 1939 Code by the Revenue Act of 1942, 56 Stat. 846, and reenacted in the 1954 Code without change.

The explanation for the proposed enactment of the predecessor of § 1231(a) in the Revenue Act of 1942 was contained in the Report of the Committee on Ways and Means, House Report No. 2333, 77th Cong., 1st Sess., 1942–2, Cum. Bull. 372, 415, as follows:

> Under existing law, the gain or loss from the sale or exchange of depreciable property is not treated as a capital gain or capital loss, but as an ordinary gain or an ordinary loss. This rule was originally inserted as a relief provision to enable corporations to have the full benefit of a loss from the sale of machinery, instead of being limited by the capital loss provisions, which would permit it only a certain percentage of the loss. It was felt at that time that the taxpayer should not be denied the full loss because it sold the property at a loss instead of abandoning the property. While this rule provided relief in case a loss was realized, it appears that many taxpayers are able to dispose of their depreciable property at a gain over its depreciated cost. *To treat such a gain as an ordinary gain will result in an undue hardship to the taxpayer.* For example, a taxpayer sells certain trawlers used in his business to the Government. If the gain from the sale is regarded as an ordinary gain, it may result in the taxpayer receiving practically nothing for his property. Another example is where the proceeds of insurance on destroyed property exceed the cost of the property. The existing law treats such gain as ordinary income. *The gain or loss resulting from the involuntary conversion of property into other property or money is also treated as an ordinary gain or loss. The theft of an article which is insured is an example in point.* Your committee has provided the following solution for this problem:

> (a) If the total gains in such cases exceeds the losses, such gains shall be considered as gains from the sale or exchange of capital assets held for more than 15 months. Buildings and similar real property improvements are not included in this provision, unless gains or losses therefrom result from an involuntary conversion. This is because buildings and similar real property are treated under a different provision of the bill. In determining whether the gains exceed the losses, 100 per cent of such gains or losses are taken into account. In the case of involuntary conversions, the existing law is amended to provide that the loss shall be recognized upon the conversion.

> (b) If the gains do not exceed the losses in such cases, such gains and losses will be treated as ordinary gains and ordinary losses instead of capital gains or capital losses. Where the losses exceed the gains, the excess loss will be deductible from income as an ordinary loss. [Emphasis supplied]

The pertinent Senate and House committee reports for the 1954 Code (3 U.S. Code Cong. & Ad. News, pp. 4017, 4417, 4621, 5076, 83d Cong.2d Sess., 1954) expressed no legislative intent concerning reenactment of § 117(j) as § 1231, except the statement that no substantive change was intended.

In 1943, the Internal Revenue Service issued regulations concerning the Revenue Act of 1942, as amendments to Treas.Reg. 103, and among them, was new § 19.117–7 pertaining to new § 117(j) of the 1939 Code, 1943 Cum.Bull. 314, 327, which new regulation provided in pertinent part as follows:

In determining whether such gains exceed such losses for the purposes of section 117(j), losses upon the destruction in whole or in part, theft or seizure, requisition or condemnation of the property described in section 117(j) are included *whether or not there was a conversion of such property into money or other property.* For example, if a capital asset held for more than six months, with an adjusted basis of $400, is stolen, and the loss from this theft *is not compensated for by insurance* or otherwise, the $400 loss is included in the computations under section 117(j) to determine whether gains exceed losses. * * * [Emphasis supplied]

In substance, this same language was included in Treas.Reg. § 1.1231–1(e) applicable to § 1231(a) of the 1954 Code, 26 C.F.R. § 1.1231–1(e) (Rev. to 1–1–58).

Taxpayer contends that there is no statutory foundation for this regulation, and that such regulation is contrary to the plain language of 1954 Code § 1231(a) and its predecessor, 1939 Code § 117(j), providing for offsets of gains against conversion losses only when the conversions of property are into property or money, leaving unqualified the provisions of 1954 Code § 165(a) for deduction of uninsured casualty losses.

In 1958, 1954 Code § 1231(a) was amended (Technical Amendments Act of 1958, 72 Stat. 1606, 1642) to apply to taxable years beginning after December 31, 1957, by adding the following sentence at the end of such section:

In the case of any property used in the trade or business and of any capital asset held for more than 6 months and held for the production of income, this subsection shall not apply to any loss, in respect of which the taxpayer is not compensated for by insurance in any amount, arising from fire, storm, shipwreck, or other casualty, or from theft.

The proposed enactment of this amendment was explained in the Report of the Committee on Finance, Senate Report No. 1983, 85th Cong., 2d Sess., 1958–3 Cum.Bull. 922, 995–996, as follows:

Under present law there there are uninsured losses on property as a result of its destruction, theft, seizure, requisition, or condemnation, such losses, in the case of property used in the trade or business or capital assets held for more than 6 months, are treated as section 1231 losses. These casualty losses coming under section 1231 of the code must be added together with other gains and losses from sales or exchanges of property used in a trade or business and with other gains or losses from involuntary conversions. If the resulting net amount is a gain, under section 1231 it is treated as a long-term capital gain and in effect taxed at a rate no higher than 25 percent. If, on the other hand the net amount is a loss, under section 1231 it is treated as an ordinary loss which can be offset against income taxed at the regular tax rates.

Where a taxpayer elects to be a self-insurer against casualty losses, there seldom is a conversion into money or other property, as there would be if the destroyed property were insured. If this casualty loss were the only loss incurred during the taxable year by the self-insured person, he would be entitled to the full benefit of an ordinary loss deduction under section 1231, but where there are also 1231 gains, the casualty loss is partially or wholly offset against these gains which would otherwise be taxed as capital gains. As a result, the benefit of having casualty losses treated as ordinary, rather than capital, losses may be reduced or eliminated in the case of self-insurers, depending on the fortuitous circum-

stance as to what gain the taxpayer may have from trade or business assets or involuntary conversions. This is not a problem for those who are fully insured by others because they receive insurance payments in the case of destroyed property which offset the casualty losses which would otherwise be realized. Moreover, such persons may deduct currently the cost of their insurance for property used in a trade or business. Thus, in their case they obtain a deduction against ordinary income for any premiums paid and any gains from trade or business assets (or involuntary conversions) are taxed as capital gains and are not offset against losses (since these are covered by insurance) which would otherwise be treated as ordinary losses.

*Your committee believes that this constitutes an unintended hardship and for that reason it has added a provision to the House bill amending section 1231(a) of the code.* The provision added makes section 1231 inapplicable in the case of losses where the taxpayer is not compensated for the loss by insurance, if the loss arises from fire, storm, shipwreck, or other casualty or from theft. This treatment is to apply, however, only in the case of property used in the trade or business and in the case of capital assets held for more than 6 months and held for the production of income. The effect of this provision will be to treat such losses always as ordinary losses and never to offset them against gains which might otherwise be treated as capital gains. [Emphasis supplied.]

This Senate Report contained further explanation, 1958–3 Cum.Bull. at 1124–1125, as follows:

Your committee has provided this section to separate certain uninsured casualty losses from the computation of section 1231 gain or loss, but only with respect to property used in the trade or business and capital assets held for the production of income which have been held more than 6

months. The amendment applies with respect to, for example loss incurred as the result of the destruction of a taxpayer's oil tanks which he used for oil storage in his trade or business, but on which he was unable to obtain insurance. On the other hand, *the amendment does not apply to loss arising from the destruction or theft of the taxpayer's uninsured personal automobile.* * * * [Emphasis supplied.]

Until very recently there was no case involving the precise factual situation in this case, *i. e.,* an uninsured casualty loss to *business* property in a taxable year prior to the effectiveness of the 1958 amendment of section 1231(a). The decided cases all concern *nonbusiness* properties, *i. e.,* uninsured loss by storm or other casualty of trees and shrubbery on residential property, or of personal jewelry by theft.

In Weyerhaeuser Co. v. United States, 402 F.2d 620 (9th Cir. 1968) the court was confronted with the taxpayer who suffered uninsured losses of business property during the years 1954–1957. There, as in this case, taxpayer argued that its losses were deductible from ordinary income. The court said, and we agree, that:

In failing to include personal-use property in the 1958 amendment, Congress clearly evidenced its opinion that the amendment was necessary to accomplish, for taxable years beginning in 1958, the treatment of income-producing property which Weyerhaeuser here claims was already proper before the amendment. Or, to state this another way, Congress in 1958 obviously believed that the rule announced in *Maurer*—involving personal-use property losses [5] during the

5. Although *Maurer* involved the uninsured loss of property held for personal use, the Tenth Circuit did not attempt to draw, for § 1231(a) purposes, any distinction between property held for personal use and income-producing property.

taxable year 1954—was not the pre-

1958 law as to income producing property. Yet, as pointed out above, no basis for distinction between income-producing and personal-use property existed prior to 1958. It is evident, therefore, that Congress in 1958, at least by implication, rejected the interpretation which had been placed upon the section by the *Maurer* court.

In any event, it is apparent, we think, that, since no other change was made by the 1958 amendment, the pre-1958 rule for all types of property covered by the section, including the income-producing type here in question, should be held to the same as the post-1958 rule applicable to property held for personal use. The Fourth, Fifth, and Sixth Circuits have each cluded that the post-1958 rule for property held for personal use is that all losses, both insured and uninsured, are covered by section 1231(a). Campbell v. Waggoner, 370 F.2d 157 (5th Cir. 1966); Chewning v. Commissioner of Internal Revenue, 363 F.2d 441 (4th Cir.), *cert. denied*, 385 U.S. 930, 87 S.Ct. 289, 17 L.Ed.2d 212 (1966); Morrison v. United States, 355 F.2d 218 (6th Cir.), *cert. denied*, 384 U.S. 986, 86 S.Ct. 1887, 16 L.Ed.2d 1004 (1966). In reaching their conclusions that, as to property not covered by the 1958 amendment, section 1231(a)'s coverage extends to both insured and uninsured losses, each of these three courts of appeal specifically rejected the *Maurer* court's reasoning. The discussions in The *Morrison* and *Campbell* opinions on the point are particularly worthy of reference. We share the conviction that the *Maurer* court erred in its conclusion. [402 F.2d at 628, 629.] In Maurer v. United States, 284 F.2d 122 (10th Cir. 1960), the taxable year was 1954, during which taxpayers suffered uninsured casualty losses of trees and valuable plantings on residential property, and the question was whether there was an ordinary loss under § 165 or a capital loss under § 1231. The Tenth Circuit held that § 1231 was inapplicable, but recognized that the language of Treas.Reg. § 1.1231–1(e) (ruling that involuntary conversions are to be treated under § 1231 whether or not there is a conversion into other property or money) could lead to only one of two conclusions, either that such regulation is clearly inconsistent with the terms of the statute and invalid, or else it is inapplicable in the particular situation involved. The court refrained from deciding the question of validity of the regulation "in the face of the plain wording of Section 1231," commenting that such regulation might be an attempt to distinguish involuntary conversions from casualties, but that because the jury had found that the loss was a casualty, the court was presented with no question turning on such a distinction. In Oppenheimer v. United States, 220 F.Supp. 194 (W.D.Mo.1963), the taxable year was 1956, during which taxpayers had an uninsured casualty loss of trees and other valuable plantings on residential property, and also a greater net long term gain from the sale of a farm. Without discussion of the legal problem, but relying on desirability of uniformity of decision in the field of federal taxation, the district court followed *Maurer*, *supra*, and held that the casualty loss was deductible from ordinary income pursuant to § 165, and that it was not required under § 1231 that such loss be offset against the gain on the sale of the farm.

The only other decided cases involve taxable years after the effectiveness of the 1958 amendment of § 1231(a). In Morrison v. United States, 355 F.2d 218 (6th Cir. 1966), *cert. denied*, 384 U.S. 986, 86 S.Ct. 1887, 16 L.Ed.2d 1004 the taxable year was 1960, during which taxpayer sustained an uninsured casualty loss of trees, shrubbery, and other improvements on residential property, and also realized a greater gain on the sale of an orange grove held for production of income. The Sixth Circuit rejected taxpayer's argument that because there was no conversion of property into other property or money, the loss in question was not included in the type of

losses intended to be covered by § 1231(a), and held that taxpayer was not entitled to deduct her loss as an ordinary loss under § 165(c) (3), but that the loss had to be offset against the gain from the sale of the orange grove under § 1231(a). The court commented that by the 1958 amendment, Congress excluded from the application of § 1231, property used in the trade or business and any capital asset held for more than 6 months and held for the production of income, where the taxpayer was not compensated by insurance in any amount, but that it was significant that Congress did not exclude the classification of "capital assets held for more than six months." Prior to the 1958 amendment, the pertinent Treasury Regulation had since 1943 included uninsured casualty losses within the application of § 1231 and its predecessor. While recognizing that no validity can attach to a Treasury Regulation which is inconsistent with the statute, the court concluded that the controlling principle was that announced by the Supreme Court in Helvering v. Winmill, 305 U.S. 79, 83, 59 S.Ct. 45, 46, 83 L.Ed. 52 (1938), as follows:

> Treasury regulations and interpretations long continued without substantial change, applying to unamended or substantially reenacted statutes, are deemed to have received congressional approval and have the effect of law.

The court relied upon the legislative history of the 1958 amendment, as expressing the same view, i. e., that the pertinent regulation expressed existing law prior to such amendment. The Sixth Circuit expressed "great respect" for the opinion of the Tenth Circuit in the *Maurer* case, *supra*, but concluded that its view was the more logical one, and that it conformed to the intent of Congress in enacting the legislation. In accordance with the stipulations of the parties to be bound by the decision in the *Morrison* case, *supra*, and after denial of certiorari in that case, the Sixth Circuit reversed district court decisions for taxpayers in two other similar cases and remanded for entry of judgment in favor of the United States. Dawson and Hall v. United States, 66–2 U.S. Tax Cas. ¶ 9674 (1966); Killebrew v. United States, 66–2 U.S. Tax Cas. ¶ 9675 (1966).

The reasoning of the *Maurer* case was also rejected by the Fourth Circuit in sustaining the ruling of the Tax Court that a taxpayer's 1960 casualty loss of boxwood bushes on residential property had to be offset under § 1231(a) against gains realized by taxpayer in the same year from sales of property used in his trade or business. Chewning v. Commissioner of Internal Revenue, 44 T.C. 678 (1965), *aff'd per curiam*, 363 F.2d 441 (4th Cir. 1966), *cert. denied*, 385 U. S. 930, 87 S.Ct. 289, 17 L.Ed.2d 212.

In Campbell v. Waggoner, 370 F.2d 157 (5th Cir. 1966), the court also rejected the *Maurer* decision and approved the holdings in *Morrison* and *Chewning*, in ruling that the taxpayers could not deduct their personal jewelry theft loss, sustained in taxable year 1960, as an ordinary loss from ordinary income under § 165(c) (3), but such loss had to be offset under § 1231(a) against the gain from the sale in the same taxable year of depreciable assets used in their trade or business. The Fifth Circuit considered the legislative history of § 1231(a) and the longstanding regulation involved, and concerning the 1958 amendment of that section, stated.

> * * * By this amendment Congress made it clear that prior thereto all wholly uncompensated casualty and theft losses were covered by section 1231. The 1958 amendment had the effect of excluding from Section 1231 treatment only wholly uncompensated casualty and theft losses used in the trade or business and of any capital asset held for more than six months and held for the production of income. Congress thus unmistakably showed that it did not wish to exclude from the effect of Section 1231 wholly uncompensated casualty and theft losses on property *not* used in a business or

**1314**

*not* held for the production of income, and the legislative history so reflects. [370 F.2d at 159–160]

 Perhaps the taxpayer's position is not entirely devoid of merit. However, it is our opinion that the *Weyerhaeuser* and *Morrison* decisions are applicable and that the validity of the regulation should be sustained. Taxpayer's uninsured casualty losses on its business assets must be offset by gains realized on the sale of real property and depreciable assets used for more than six months in its business. Accordingly, taxpayer is not entitled to recover on this issue.

